2023 IL App (1st) 191607-U

SECOND DIVISION
December 29, 2023

No. 1-19-1607

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 13 CR 5936 |
| | ) | 13 CR 5937 |
| | ) | |
| EVARISTO SANTA MARIA, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirmed in part; reversed in part; remanded for resentencing. Evidence was sufficient to convict defendant of predatory criminal sexual assault against two victims. Trial court did not err in admitting propensity evidence, outcry evidence, or expert testimony; or in joining charges for trial. Failure to give IPI 11.66, and trial court comment about defendant's absence from trial during jury selection, were harmless error. Prosecutors did not commit misconduct warranting new trial. Of two natural-life sentences imposed, one was improper, where conduct pre-dated enactment of statutory provision authorizing the sentence.

¶ 2    Defendant Evaristo Santa Maria was charged with predatory criminal sexual assault (PCSA) and aggravated criminal sexual abuse (ACSA) against S.S. and S.F., two young female relations of women with whom defendant, at different times, was sexually involved. He posted bond and agreed to have the two cases, which were charged separately, joined for trial. As the

trial date approached, defendant absconded, ostensibly returning to his native Honduras. He was later apprehended in Nicaragua, but not before he was convicted and sentenced *in absentia*.

¶ 3       Defendant challenges the sufficiency of the evidence. He argues that the trial court erred in admitting propensity evidence, outcry evidence, and expert testimony; improperly joined the charges for trial and remarked on his absence during jury selection; and failed to give a required instruction on the jury's consideration of the outcry evidence. He alleges "pervasive" misconduct by the prosecutors throughout the trial. Lastly, he argues that the trial court erroneously imposed a natural-life sentence for his PCSA conviction in the S.S. case. He does not challenge a second natural-life sentence that was imposed for his PCSA conviction in the S.F. case.

¶ 4       We agree with some of defendant's contentions of trial error, but we do not find any error that warrants reversal of his convictions. The State concedes that the PCSA conviction in the S.S. case was not eligible for a natural-life sentence. We thus vacate that sentence and remand the S.S. case, 13 CR 5937, for resentencing. Defendant's convictions, and his natural-life sentence in the S.F. case, 13 CR 5936, are affirmed.

¶ 5                                   BACKGROUND

¶ 6                                   I. Overview

¶ 7       During the 1990s, defendant was in a romantic relationship and living in Chicago with Rita L., who was S.S.'s grandmother. S.S. lived in the suburbs with her aunt but spent weekends with her grandmother and defendant. In May 2000, S.S. told her father that defendant sexually abused her. Among other investigative steps, S.S. met with a forensic interviewer to discuss the alleged events, which took place between 1997 and 1999, when S.S was around 8 to 10 years old. Defendant was arrested in August 2000 but was released without being charged.

¶ 8       Defendant soon returned to Honduras, where he became romantically involved with F.U.

They had two children together; F.U. also had two children from a prior relationship, including a young daughter named S.F. In the early 2000s, defendant moved back to Chicago and lived here with F.U. and the kids.

¶ 9     In 2007, when S.F. was 9 years old, she ran crying into her older sister L.M.'s room and said, in L.M.'s words, that defendant "was trying to touch her." L.M., who was 14 years old, was too scared to tell anyone about S.F.'s allegations at the time, though eventually, after a "long time" had passed, she did tell her mother.

¶ 10     S.F.'s allegations remained within her immediate family circle until 2010, when she told a friend at school about one instance of sexual abuse. By then, defendant had moved out of the house and, as S.F. understood, had returned to Honduras. S.F.'s outcry at school prompted an investigation. S.F. soon met with a forensic interviewer and reluctantly explained that defendant sexually abused her multiple times between 2004 and 2007. The investigation was put on hold, however, because defendant could not be found.

¶ 11     The police eventually found defendant and arrested him, in Chicago, in February 2013. S.S. and S.F. were interviewed anew, and the State charged him, in two separate informations, with PCSA and ACSA against S.S. and S.F. Defendant posted bond and surrendered his Honduran passport. At his arraignment, he was admonished (as to both cases) that he could be tried and sentenced *in absentia* if he failed to appear. Defendant, speaking through a Spanish interpreter, acknowledged that he understood.

¶ 12     The State initially elected to proceed on the S.S. case but later switched its election to the S.F. case. The State moved to admit S.F.'s outcry statements to L.M. in 2007; to the forensic investigator, Lynn Aladeen, in her 2010 victim sensitive interview (VSI); and to Chicago Police Detective Emily Rodriguez in 2013. See 725 ILCS 5/115-10 (West 2022). The trial court held an

evidentiary hearing and granted the motion.

¶ 13    The State moved to admit proof of defendant's alleged abuse of S.S. as other-crimes evidence in the S.F. case. The trial court granted the motion and thus admitted the evidence for propensity (and any other relevant) purposes. See 725 ILCS 5/115-7.3 (West 2022).

¶ 14    After the other-crimes motion was granted, the State moved to join the charges in the two cases for trial. Defense counsel did not object. To the contrary, counsel said, given the rulings on the other-crimes and section 115-10 motions, joinder was now part of the "defense strategy;" it also served "judicial economy." Counsel discussed the "pros and cons" with defendant, who later confirmed, on the record, that he agreed to the joinder and remained "confident" about his defense at a joint trial.

¶ 15    With the cases now joined, the State moved to admit S.S.'s initial outcry to her father and her ensuing statements in the VSI conducted by forensic interviewer Dr. Jill Schoeneman-Parker. The trial court held an evidentiary hearing and granted the motion.

¶ 16    In April 2015, as the trial date approached, defendant failed to appear in court. Defense counsel had been trying to find him for some time. About two months later, the State detailed its own efforts to locate defendant at an evidentiary hearing. The trial court found that he willfully absented himself from the proceedings and thus granted the State's motion to try him *in absentia*.

¶ 17    The case proceeded to trial in September 2015. On the first morning, before jury selection began, the State asked the court to "double check" its ruling on the other-crimes motion. Strictly speaking, the court had ruled that the State could offer evidence of defendant's conduct toward S.S. as other-crimes (in particular, propensity) evidence on the S.F. charges. But the other-crimes motion was resolved before the charges were joined. In light of the joinder, the State argued, it should now be allowed to "argue propensity in both directions for both victims." The trial court

agreed, over a timeliness objection from the defense.

¶ 18    Since the prospective jurors could hardly fail to notice that defendant was not present for his own trial, the court preemptively addressed the matter in its opening remarks to the venire. The court explained that defendant was admonished about the possibility of a trial *in absentia* and that the court previously "made a finding that [he] had willfully absented himself from trial and that is why we are proceeding today in his absence."

¶ 19    The parties treated defendant's current whereabouts as a jury question, and a disputed one at that. Throughout its case in chief, the State thus detailed, at some length, its efforts to locate him. The defense presented evidence of its own. In our view, this evidence had at best marginal relevance to the questions before the jury—whether defendant sexually assaulted or abused either or both of the victims. And it does not bear directly on any other appellate issue. So we will, for the most part, leave it aside and limit our summary to the pertinent evidence.

¶ 20                                    II. Evidence regarding S.S.

¶ 21    By the time of trial, S.S. was 26 years old. In her childhood, she often spent weekends with her grandmother, where she got to know defendant, her grandmother's partner for a time. S.S. knew defendant as "Oscar." She recounted two specific incidents of sexual abuse when she was between the ages of 7 and 9.

¶ 22    The first incident took place in the living room in the house on Dickens Avenue in Chicago, where defendant lived with S.S.'s grandmother. S.S., then around 7 years old, was alone in the house with defendant, who asked her to sit on his lap while they watched TV. S.S. agreed. As defendant bounced her on his lap, she "felt something poking me on my butt while I was sitting down." At the time, S.S. didn't know what was poking her, but as an adult she now understood that it was defendant's erect penis. S.S. kept falling off, but defendant kept pulling

her back up and onto his lap. Defendant did not expose his penis or remove his pants. As a child, S.S. thought it was a "joke." So she did not tell her grandmother, or anyone else. At least not yet.

¶ 23    The second incident took place in the spring or summer of 1998, when S.S. was 9 years old, at a house on Kostner Avenue in Chicago that her grandmother and defendant had since purchased together. S.S. had her own bedroom at the new house, and defendant, a mariachi, kept his instruments in the closet. Late one night, defendant came home from a show, smelling of alcohol and apparently drunk, and stumbled into the bedroom to put away his instruments. Defendant pulled S.S. to the side of the bed, removed her panties, and put his penis between the lips of her vagina and started "moving it around." S.S. laid still and pretended to be asleep.

¶ 24    Afterwards, S.S. went to the bathroom. She found some "white sticky stuff" on herself and cleaned it off. She didn't recognize it at the time, but now as an adult she understood that it was semen. As S.S. recalled, her grandmother was home (and asleep) when this happened, but S.S. did not tell her, or anyone else, what happened, because she was too scared. After this incident, however, S.S. did her best to avoid going to her grandmother's house.

¶ 25    S.S. testified that defendant sexually abused her on other occasions between these two incidents. But her recollections were "fairly vague" and she did not provide any details of the alleged incidents. Nor did she tell anyone about them.

¶ 26    S.S.'s initial outcry came about two years after the bedroom incident, in May 2000. Her father, Jamie S., had recently been released from prison and was trying to be present in S.S.'s life. One day, while on a walk together, Jamie encouraged S.S. to talk openly about anything she wished. This prompted S.S. to speak candidly, for the first time, about the sexual abuse that she had endured. As Jamie testified, S.S. told him that defendant "put his private in her private." The family immediately called the police.

¶ 27    According to Detective Alvarez-Pena, the lead investigator, Jamie reported that S.S. did not want to pursue these allegations—she did not, as Jamie put it, want to "go to court." (For his own part, Jamie did not specifically remember saying this, but he agreed that he might have.) Detective Alvarez-Pena also arranged for S.S. to have a VSI with Dr. Schoeneman-Parker.

¶ 28    Dr. Schoeneman-Parker testified that S.S. was, to say the least, "not cooperative" during the VSI. In fact, she was downright "hostile" at times, displaying a "[g]uarded, angry, moody" demeanor. Dr. Schoeneman-Parker went so far as to say that, despite the passage of time, she still retained her impressions of the interview because S.S. appeared so memorably "hardened" by her experiences. S.S.'s demeanor and apparent hostility toward the process made it difficult for Dr. Schoeneman-Parker to establish rapport with S.S. in the usual way.

¶ 29    We will return to this point later, when we take up defendant's challenge to the admission of the outcry evidence. For now, suffice it to say that after all the usual approaches failed, Dr. Schoeneman-Parker made one last-ditch effort to get S.S. talking. She said something to this effect: "I know you don't want to be here. I know you don't want to talk with me. I know you don't want to answer these questions. The faster you answer these questions, the faster you are out of here, and you don't have to come back here again."

¶ 30    And with that, S.S. opened up and starting talking "non-stop." Dr. Schoeneman-Parker could not remember all the details, and she gave conflicting answers as to whether she prompted S.S. with any follow-up questions or whether S.S. delivered an uninterrupted account. In any event, as she recalled, S.S. told her that defendant put his penis into her vagina, that she went to the bathroom afterwards, and that one incident (possibly the same bedroom incident, but that is not clear) took place in her grandmother's bedroom. Dr. Schoeneman-Parker never testified that S.S. disclosed the alleged incident in the living room. And she could not recall whether S.S. said

anything about finding a "white sticky stuff" when she went to the bathroom.

¶ 31                                    III. Evidence regarding S.F.

¶ 32    S.F. was 17 years old at the time of trial. She was born in Honduras and her father died there when she was a baby. Her mother, F.U., became romantically involved with defendant, who was effectively S.F.'s step-father and whom S.F. used to call "dad." They came to Chicago when S.S. was five; her older sister, L.M., eventually moved here from Honduras and lived with them. S.F. testified that defendant sexually abused her in three ways when she was between the ages of 6 and 9.

¶ 33    First, defendant groped S.F.'s breasts when she was 6 or 7 years old. There were two such incidents, both at the family home, while F.U. was at work. One happened in the kitchen. Defendant asked if he could touch S.F.'s breasts; she said no, but he did anyway. The other incident happened in the dining room, but S.F. could not recall any further details. Nor did she tell anyone about either of these incidents.

¶ 34    Second, defendant touched his penis to S.F.'s buttocks. S.F. could not recall exactly when this happened, but she was somewhere between the ages of 6 and 9. Defendant was in his bed, laying on his back. He sat S.F. on top of him, so that she faced him and straddled him with her legs. He put his hands on S.F.'s hips and bounced her up and down, rubbing his penis against her buttocks. They were both clothed. Defendant did not say anything to her afterwards. S.F. said that this type of abuse happened more than once.

¶ 35    Third, defendant touched S.F.'s vagina when she was 8 years old. One night, S.F. fell asleep in her daytime clothes while watching T.V. in the living room. Her mother and siblings were home and (except for L.M.) asleep. Around midnight, S.F. awoke to find defendant laying next to her on the floor and smelling of alcohol. Defendant touched S.F., put his hand up her jean

skirt and inside her underwear, and rubbed the lips of her vagina. Defendant told S.F. to "stay quiet and not say anything." He kept his clothes on and went to his bedroom afterwards.

¶ 36    Meanwhile, L.M., who was 14 at the time, was doing her homework in the bedroom she shared with S.F. She heard S.F. crying in the living room. S.F. came running into the bedroom, still crying and shaking. S.F. said that defendant was "on top of her," "trying to touch her," and "trying to pull [her] skirt up." But S.F. did not say that defendant actually touched her vagina.

¶ 37    L.M. asked if S.F. was sure about all this, and S.F. said she was. They never talked about that night again. And they were both too scared to tell anyone else about it at the time.

¶ 38    L.M. did eventually tell F.U. about the outcry, but not before a "long time" had passed. L.M. could not recall exactly when she told F.U., but she testified that it was before defendant moved out of the house, and apparently returned to Honduras, sometime in 2007 or 2008. In fact, L.M. testified that he left precisely because these allegations had been aired.

¶ 39    For her own part, S.F. testified that she was scared to speak up because defendant had "hit her" at least once before. (This in addition to the obvious reasons why any child would be frightened in these circumstances, physical violence aside.) In particular, defendant once struck S.F. in the back with a belt, for reasons that S.F. could not discern. Beyond that, S.F. could not provide any details of this incident.

¶ 40    S.F. did not tell anyone (other than her sister) about the abuse until 2010, when she was 12 years old. By then, defendant was long out of the house. S.F., who was still "traumatized," told a friend at school. Teachers and school administrators got wind of her outcry and informed the police. In November 2010, Detective Rodriguez arranged for S.F. to have a VSI with forensic interviewer Lynn Aladeen and a physical examination with Dr. Marjorie Fujara.

¶ 41    Aladeen testified to the details of the forensic interview. Her testimony was based on the

interview notes taken by Detective Midlowski, filling in for Detective Rodriguez, who was either off work or in court on the day of the interview. Aladeen acknowledged that she no longer had an independent recollection of the interview. In sum, according to the interview notes, S.F. said that the father of her little sister (namely, defendant) touched her breasts, buttocks, and vagina at various times. S.F. could not remember the first time any such abuse took place, but the last time was when she was 9 years old. S.F. did speak more specifically about the incident in the living room: when she was 6 or 7, she woke up to find defendant touching her vagina with his finger. He was drunk and told S.F. not to tell anyone. S.F. said that she told her older sister about this incident when she was 8; S.F. never told Aladeen that she ran into the bedroom immediately afterwards and told L.M. what happened.

¶ 42     Dr. Marjorie Fujara testified as an expert in child-abuse pediatrics, and child sexual abuse in particular. S.F.'s physical exam was normal. But Dr. Fujara was not at all surprised: 95% of sexually abused children have normal physical exams, even when the abuse is confirmed by objective evidence like a video, and even when there was an immediate outcry, defined as one made within 72 hours of the alleged abuse. (Pediatricians use this cutoff because it determines whether or not an evidence kit should be collected.) And here, there was a years-long delay.

¶ 43     During the exam, S.F. pointed to her chest and crotch and told Dr. Fujara that her step-father touched her in these places. Dr. Fujara did not ask her to elaborate. S.F. did not tell the doctor that defendant touched her buttocks with her penis, struck her with a belt, or physically abused her mother.

¶ 44     Dr. Fujara opined that while children under the age of 10 can reliably report being harmed, the cognitive development needed to accurately place those events in time generally does not begin to emerge before age 12. The doctor explained that "grooming" is a process in

which an abuser builds trust with a child over time, by conferring affection and attention on the child that initially seems appropriate but escalates over time into inappropriate conduct. Lastly, over defense objection, Dr. Fujara further opined that children make delayed outcries in the "[v]ast majority" of cases, particularly when the abuser is someone they know, and went on to explain various reasons why this is believed to be the case.

¶ 45    L.M. also participated in the 2010 investigation. She spoke to a DCFS case worker about S.F.'s outcry to her in 2007. By the time of trial, L.M. could not remember what she told the case worker, but she insisted that she said something about S.F. claiming to have been touched. In its own case, the defense presented stipulated testimony from the case worker, Angely Diaz, that L.M. did not remember what S.F. had said to her years earlier.

¶ 46    Later, in 2012, L.M. saw defendant at a factory where she worked. Despite the pending investigation, she did not call the police; at the age of 17 or 18, she was still young and scared and did not know what to do.

¶ 47    Detective Rodriguez interviewed S.F., L.M., and F.U. after defendant was arrested in 2013. She also interviewed S.S. after learning that there was a pending investigation into her own allegations against defendant. But at trial, the State did not offer any of the various statements that these witnesses made to Detective Rodriguez, even though the trial court had granted a pre-trial motion admitting at least some of them.

¶ 48    Apart from the Diaz stipulation, the only other defense witness was Edward Mielke, defendant's boss at a Chicago printing company, who testified that defendant took vacation time in February 2015 and never returned to work.

¶ 49                    IV. Verdicts, post-trial motions and sentencing

¶ 50    The jury found defendant guilty on two counts of PCSA (penile penetration of S.S., and

digital penetration of S.F.) and three counts of ACSA (groping S.F.'s breasts, and rubbing his penis against the buttocks of S.S. and S.F.) The trial court merged the three ACSA convictions into the two PCSA convictions and imposed life sentences, *in absentia*, on each PCSA count. As the trial court construed the applicable statute, these life sentences were both mandatory.

¶ 51 The FBI apprehended defendant in Guatemala in January 2019. Counsel filed a second motion for new trial, this time arguing that defendant should not have been tried *in absentia* because he did not willfully absent himself to avoid the proceedings; instead, he made a difficult decision to skip his trial and return home to care for his ill mother in Honduras. The trial judge had since retired; the case was reassigned, and the new judge denied the motion.

¶ 52                                              ANALYSIS

¶ 53                                   I. Sufficiency of the evidence

¶ 54 Defendant argues that the evidence was not sufficient to convict him beyond a reasonable doubt of any offense, be it PCSA or ACSA, against either S.S. or S.F.

¶ 55 As a preliminary matter, the trial court merged the ACSA convictions into the PCSA convictions and sentenced defendant only on the two convictions for the latter offense. Absent certain exceptions that are not relevant here, our sufficiency review is limited to the convictions on which defendant was sentenced and does not encompass any convictions that were merged. *People v. Fort*, 2019 IL App (1st) 170644, ¶ 37 (appellate court "cannot consider" sufficiency challenge to merged conviction); *People v. Jones*, 2019 IL App (1st) 170478, ¶¶ 23-24 (same); see *People v. Relerford*, 2017 IL 121094, ¶¶ 71-76 ("[T]he appellate court lacked jurisdiction to decide the validity of defendant's unsentenced convictions."); *People v. Caballero*, 102 Ill. 2d 23, 51 (1984) ("The final judgment in a criminal case is the sentence, and, in the absence of the imposition of a sentence, an appeal cannot be entertained.").

¶ 56     If we were to reverse the PCSA counts, thus reinstating the merged ACSA counts, the sufficiency of the evidence on the latter charges would properly be at issue. But for the reasons that follow, we affirm defendant's PCSA convictions against S.S. and S.F. Thus, we limit our discussion to those two offenses. (And for what it's worth, what we say below would largely dispose of defendant's challenges to his ACSA convictions, anyway, since those challenges are based, by and large, on the same credibility arguments that we consider and reject.)

¶ 57     A conviction will not be reversed on sufficiency grounds unless the evidence was so "unreasonable, improbable, or unsatisfactory" that, viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's findings regarding the credibility of witnesses, the inferences to be drawn from the evidence, and the appropriate resolution of conflicts in the evidence, are not conclusive, but they are all entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 58     The offense of PCSA requires proof of an act of sexual penetration by a person 17 years or older (as defendant was) against a victim who is under 13 years of age (as S.S. and S.F. both were). 720 ILCS 5/12-14.1(1), renumbered as 720 ILCS 5/11-1.40(a)(1) by P.A. 96-1551 (eff. July 1, 2011). Sexual penetration includes "any contact, however slight, between the sex organ *** of one person and *** the sex organ *** of another person" (as relevant to S.S.); and "any intrusion, however slight, of any part of the body of one person ***into the sex organ *** of another person" (as relevant to S.F.). 720 ILCS 5/11-0.1.

¶ 59     S.S. testified that, in the spring or summer of 1998, defendant came into her room, drunk and late at night, to put away his mariachi instrument, which he kept in her bedroom closet. S.S. had been asleep. Defendant moved her to the side of bed and pulled down her panties. He put his

penis between the lips of S.S.'s vagina, touching her "hole" and "moving [his penis] around."

Upon going to the bathroom afterwards, S.S. found what she now knew to be semen on herself.

¶ 60    S.F. testified that when she was around 8 years old, she fell asleep while watching TV in the living room. She awoke to find defendant, smelling of alcohol, lying next to her. He put his hand up her skirt, inside her underwear, and "rubb[ed] the lips of [her] vagina."

¶ 61    This testimony establishes the essential elements of the PCSA offenses against S.S. and S.F. And the "testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). So this testimony alone, to say nothing of the propensity and outcry evidence, is enough to sustain defendant's convictions—provided, of course, that a rational trier of fact, viewing all of the evidence in the light most favorable to the State, could find the victims credible.

¶ 62    Defendant's principal sufficiency challenge thus comprises a series of impeachment arguments meant to show that the victims' testimony was "not credible enough" on its own—that is, without corroboration from physical evidence or further eyewitnesses—to provide proof beyond a reasonable doubt. He argues, in sum, that their various accounts of the sexual assaults suffered from too many vagaries, omissions, and inconsistencies to be worthy of belief.

¶ 63     We will survey some of defendant's specific points in a moment. But first, to put the trier of fact's credibility assessments in their full context, we begin with a topic that defendant is (understandably) keen to avoid in his sufficiency challenge: the propensity evidence.

¶ 64    Various sex crimes, including those charged here, are among the rare exceptions to the general rule that other-crimes (or bad acts) evidence is not admissible to show that the defendant had a propensity to commit the charged offense(s). 725 ILCS 5/115-7.3 (West 2022). The trial court thus allowed defendant's jury to consider evidence of his conduct toward one victim as

evidence of his propensity to commit similar conduct against the other victim. The inference, to be clear, runs in both directions. So the jury did not have to consider each victim's credibility as an entirely independent question. Rather, it could consider the fact that two complete strangers separately accused defendant of conduct that was strikingly similar in key respects.

¶ 65    To elaborate: S.S. and S.F. independently accused defendant of sexually abusing and assaulting them when they were between the ages of 6 and 9. They were both female relations of women with whom defendant was romantically involved, and thus they both lived in defendant's home, either full time or at least on weekends. They both alleged a pattern of conduct that escalated over time from abuse to assault. In each case, the conduct began, quite specifically, with defendant placing the child on his lap, bouncing her up and down, and, in the opening brief's own words, "grinding his penis on her buttocks." And in each case, it culminated with the child awakening to find a drunk defendant next to her and (not to put too fine a point on it for the moment) touching her labia with either his fingers or his penis.

¶ 66    This is strong evidence that defendant has a "propensity," as we say, to engage in such conduct. Jurors probably don't think in terms of "propensity inferences," but they surely grasp the underlying point: when two unrelated victims separately come forward with evidence of notably similar conduct, it is that much more likely that the allegations are essentially true and hence that the victims are fundamentally credible.

¶ 67    Defendant's efforts to impeach S.S. and S.F. must be understood against the backdrop of these propensity inferences. Indeed, because these inferences were proper, their probative value registers not *as unfair prejudice to the defense* (as it does in the usual case, when such inferences are *im*proper) but rather as *strong support for the State's case*.

¶ 68    And it bears emphasis that a victim's account "need not be unimpeached, uncontradicted,

crystal clear, or perfect in order to sustain a conviction for sexual abuse" or assault. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84. Some "minor inconsistencies or discrepancies" in a victim's testimony are perhaps to be expected, given the nature of the events at issue, and do not automatically "detract from the reasonableness of her story as a whole." *Id.* Even more so when the victims, like S.S. and S.F., were young children. See *People v. Bishop*, 218 Ill. 2d 232, 247 (2006); *People v. Guerrero*, 356 Ill. App. 3d 22, 28 (2005).

¶ 69          A. Credibility challenges regarding the S.S. conviction

¶ 70    With all of that said, we begin with S.S. Some of defendant's arguments are simply non-starters. Like this one: S.S. did not remember "what time she went to sleep" on the night of the bedroom assault or "whether she had been under the covers" before defendant assaulted her.

¶ 71    The jury could decide for itself what, if any, weight to give to the two-year delay before S.S.'s initial outcry to her father. But as we have said before, when a victim, especially a child victim, is sexually abused by a family member, the lack of an immediate outcry is neither surprising nor a meaningful hit to the victim's overall credibility. *E.g.*, *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) (noting that fear, shame, guilt, or embarrassment may all be factors here). And we would note that S.S. was scared of her abuser, as children routinely are, and so was too scared to say anything to anyone until defendant had left the home, the family, and indeed, the country.

¶ 72    In that initial outcry, defendant says, S.S. only told her father about the bedroom assault, when defendant "put [his] private in [her] private," and she did not mention the prior incidents of being bounced in defendant's lap. The point pertains most directly to the conduct underlying the ACSA charge, not the PCSA charge at issue here, but we will grant defendant that it could bear, to some extent, on S.S.'s credibility in general. Even still, the point is a weak one at best. Recall

that S.S. was a sexually abused, emotionally "hardened" child who was opening up about these traumatic experiences for the very first time, and to a father who had only recently come into her life. A rational person need not—and frankly should not—dismiss her as unworthy of belief just because she inched her way into this fraught topic.

¶ 73     The rest of defendant's arguments focus on S.S.'s statements to Dr. Schoeneman-Parker during the VSI and the various ways, in defendant's view, in which they were inconsistent with S.S.'s trial testimony and thus undermine her credibility. In particular, he says, S.S. never told Dr. Schoeneman-Parker about the lap-bouncing incident; but she did say—contrary to her trial testimony—that the bedroom assault took place in her grandmother's bedroom (instead of her bedroom at her grandmother's house) and that defendant also inserted his fingers (in addition to his penis) into her vagina.

¶ 74     The short answer is that these points of impeachment, if actually established, would be matters for the jury to weigh for itself, but none of them, or even all of them together, would compel a rational juror to reject S.S.'s testimony on the essential point: that defendant put his penis between the lips of her vagina during the bedroom assault. Notably, S.S. did not deny, contradict, or even fail to mention this essential point in *any* of the statements at issue.

¶ 75     The longer answer is that none of these points of impeachment were clearly established in the first place. Defendant is playing fast and loose with the record.

¶ 76     For one, Dr. Schoenman-Parker never testified that S.S. *didn't* mention the lap-bouncing incident. Rather, she never affirmatively testified that S.S. mentioned it. But then again, she was never asked, either on direct or cross-examination. It is an arguable inference, from the absence of any testimony on this topic, that S.S. did not mention this incident during the VSI. But it is by no means a fact established by the record. And on sufficiency review, defendant is not entitled to

have us read the record in the light most favorable to *him*.

¶ 77    The record does not establish that S.S. told Dr. Schoenman-Parker that the bedroom assault at issue here took place in her grandmother's bedroom. Rather, Dr. Schoenman-Parker agreed on cross-examination that "one of the incidents," according to S.S., took place in her grandmother's bedroom. The clear, if unspoken, implication of counsel's question was that there were incidents of assault or abuse *besides* the bedroom assault on which the PCSA conviction is based. And for whatever reason, Dr. Schoeneman-Parker was never asked about those other incidents at trial. (We acknowledge that the jury was not privy to the following information, but for the sake of context and background: at the pre-trial hearing, Dr. Schoeneman-Parker had testified that S.S. spoke of three separate incidents, the bedroom assault being one of them.)

¶ 78    Counsel asked Dr. Schoeneman-Parker if S.S. said that defendant put his fingers into her vagina, and she said yes. But counsel did not make clear *which* incident this question referred to. Defendant simply asserts on appeal that it was the bedroom assault for which he was convicted, but the record does not establish that. (Again, by way of background: at the pre-trial hearing, it was clear that Dr. Schoeneman-Parker could not pin down which incident allegedly involved digital penetration. That lack of clarity may explain why defendant was not charged with such conduct. And that, in turn, would explain why S.S. did not testify to any such conduct at trial.)

¶ 79    Lastly, in a more general vein, defendant argues that "procedural irregularities" in the VSI rendered all of S.S.'s statements to Dr. Schoeneman-Parker "unreliable." But S.S. had already alleged the essential element of the bedroom assault (in less precise, but clear enough, terms) in her initial outcry to her father. So defendant cannot plausibly argue that it was an untrustworthy artifact of an irregular and "highly suggestive" interview process.

¶ 80    We can leave the matter at that for now and largely defer our discussion of the VSI

methods until we take up defendant's challenge to the pre-trial ruling admitting this evidence.

¶ 81                    B. Credibility challenges regarding the S.F. conviction

¶ 82    Here, too, we can quickly dispose of various non-starters, points defendant makes about the living-room assault, during which defendant inserted his fingers into S.F.'s vagina: S.F. did not remember exactly when it happened, except that she was about 8 years old (and thus it was long ago). She wasn't sure how long it lasted. When she ran to her bedroom immediately afterwards, crying and shaking with fright, she neglected to give her sister a full accounting of *other* incidents of sexual abuse that she would later disclose. L.M., who was 14, did not immediately report S.F.'s outcry and was hazy on the timing of when she eventually did. S.F. and L.M. may or may not have talked about the incident again. Aladeen, the forensic interviewer, was an unreliable witness because she lacked independent recollections of the interview, nearly 5 years later, and thus relied on interview notes. Arguments like these are just not the stuff of a viable sufficiency challenge. They merit no further discussion.

¶ 83    Defendant argues that S.F.'s trial testimony was inconsistent with her outcry to L.M. in any number of ways. Granted, the accounts differed on some details, such as whether the assault commenced on the living-room floor or couch, and whether defendant was directly on top of S.F., or on his side, right next to her, with his head propped up. But these are the kinds of "minor inconsistencies or discrepancies" that "do not detract from the reasonableness of her story as a whole." *Garcia*, 2012 IL App (1st) 103590, ¶ 84. And it may be true that S.F. did not tell L.M. what defendant *said*—namely, don't tell anyone about this—but that incidental omission hardly undermines her account of what he *did*.

¶ 84    The same could be said of various discrepancies between S.F.'s trial testimony and her VSI, including her age at the time of the offense, as well as when, and how many times, S.F. told

L.M. about the assault. But we have belabored enough attempted impeachments of this general kind. So we conclude with one last argument that at least speaks to the proof of the charged conduct: L.M. testified that defendant rubbed the lips of her vagina, but as L.M. recalled, S.F. never told her that defendant actually touched her; rather, S.F. said that he "was trying to touch her." If that is literally what happened, defendant did not consummate the offense for which he was convicted.

¶ 85    But that argument takes the evidence in the light most favorable to defendant. In the light most favorable to the State, the evidence is that defendant did touch S.F.'s vagina, as she testified at trial and told Aladeen during the VSI.

¶ 86    And a reasonable trier of fact could credit S.F.'s trial testimony and the VSI evidence, L.M.'s account of the outcry notwithstanding. After all, defendant's argument stakes its claim on the precise turn of phrase purportedly used by a crying, terrified, roughly 8-year-old child immediately after a traumatic experience—not to mention the ability of another child, hearing startling revelations about the predatory conduct of an adult in the home, to recall that phrase with pinpoint accuracy some years later. (And we might add that neither S.F. nor L.M. was a native English speaker, both having been born and spent the better part of their lives, before the night in question, in Honduras.)

¶ 87    All told, defendant's attacks on the victims' credibility suffer the usual fate of such arguments on appeal. The victims' testimony, along with the evidence of their outcries and the propensity inferences the jury was (correctly) permitted to draw, were more than sufficient to convict defendant of PCSA against both S.S. and S.F.

¶ 88                    C. Evidence of penetration against S.F.

¶ 89    To convict defendant of PCSA, the State had to prove an act of "penetration" against

S.F., and this element, as alleged here, required proof of an "intrusion, however slight," of defendant's finger (or hand) "into [S.F.'s] sex organ." 720 ILCS 5/11-0.1.

¶ 90    (The legislature has since amended the PCSA statute so that any "act of contact" with S.F.'s sex organ, "however slight," would suffice for a victim of her age; penetration is no longer required. 720 ILCS 5/11-1.40(a), amended by P.A. 98-370, eff. Jan. 1, 2014. But defendant's conduct predates this amendment, so proof of penetration, as defined above, was required.)

¶ 91    Defendant argues that the proof of penetration was insufficient. For one, he says, S.F.'s trial testimony did not establish penetration, because she merely testified that he "rubb[ed] the lips of [her] vagina." During her VSI, in contrast, S.F. reportedly told Aladeen that defendant "touch[ed] the inside of her vagina with his finger." Defendant concedes that Aladeen's testimony, taken at face value, proves an act of penetration. But the significant disparity between the two accounts, he says, renders the evidence as a whole too shaky and uncertain to add up to proof of penetration beyond a reasonable doubt.

¶ 92    With apologies for the anatomical lesson, the details here are important. The female "sex organ" includes (among other anatomical structures not relevant here) "the vagina as well as the labia majora and minora, the outer and inner folds of skin of the external genital organs," or, simply put, the outer and inner vaginal lips. *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 44; *People v. Hebel*, 174 Ill. App. 3d 1, 31-32 (1988).

¶ 93    Because the vagina is an internal structure, touching the vagina, in the proper sense of the term, necessarily entails penetration. See *Hebel*, 174 Ill. App. 3d at 31-32. The inner vaginal lips, or labia minora, are also internal, and thus "[e]vidence that [the] defendant contacted this surface is conclusive evidence of penetration," even if it falls short of vaginal penetration. *Id.*

¶ 94    Evidence that the defendant touched the victim's outer vaginal lips, or labia majora, may

or may not prove penetration. If the evidence shows that the defendant touched "the inner surface of the labium majora"—if, for example, he places his finger(s) *between* them—then at least "slight penetration" necessarily occurred. *Id.* But proof that he touched only the outer surface of the labia majora is not, on its own, proof of penetration, as opposed to mere "contact" with the outermost surface of the female "sex organ" as a whole. See *People v. Maggette*, 195 Ill. 2d 336, 347, 352 (2001) ("caressing" or "rubbing" victim in "vagina area" with hand is not penetration).

¶ 95    So defendant is right about this much: S.F.'s trial testimony, read in isolation, does not establish penetration. She did not specify whether defendant rubbed her inner or outer vaginal lips, and if the latter, whether it was the inner or outer surface. Taken at face value, Aladeen's testimony about the VSI unequivocally establishes an act of penetration, but only by creating a sharp conflict—or what seems like a sharp conflict—with S.F.'s own testimony.

¶ 96    If the accounts given by an adult were conflicted like this, we might question whether the evidence proved penetration beyond a reasonable doubt. But S.F. was a child, all of 12 years old, at the time of her VSI. And Dr. Fujara explained that children typically do not perceive and describe events like these in the same way as adults. In particular, when a child says that "the finger or penis was inside of them," this often "doesn't meet the adult's perception of what inside means;" instead, "inside of them often means just between their labia."

¶ 97    As we noted above, a finger *between* the labia, including the outer labia, entails at least "slight penetration." *Hebel*, 174 Ill. App. 3d at 31. And more to defendant's point, Dr. Fujara's testimony largely reconciles the apparent disparity between the VSI evidence and S.F.'s trial testimony. To be sure, S.F. may not have described the assault with anatomical precision on either occasion. But in light of Dr. Fujara's testimony, and thus in the light most favorable to the State, there is no disparity or conflict in her accounts that renders the evidence too conflicted and

uncertain to support defendant's conviction beyond a reasonable doubt.

¶ 98                                    II. Admission of outcry evidence

¶ 99     Defendant argues that the trial court erred in admitting S.S.'s and S.F.'s various outcry statements because the State failed to show that they were reliable. Defendant concedes that the issue was forfeited below; he thus contends that the trial court committed first-prong plain error and, alternatively, that his trial counsel was ineffective.

¶ 100   Section 115-10 of the Code of Criminal Procedure provides for the admission of certain out-of-court statements made by children under the age of 13 who are victims of sex offenses. 725 ILCS 5/115-10(a)(1)-(2) (West 2022). An outcry statement can be admitted as a hearsay exception only if the "time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b)(1). This determination is based on the totality of the circumstances, and the burden of establishing reliability lies with the State. *People v. Stechly*, 225 Ill. 2d 246, 313 (2007); *People v. Zwart*, 151 Ill. 2d 37, 43 (1992). We review the trial court's ruling for an abuse of discretion, limiting our review to the record as it stood at the time of the section 115-10 hearing. *People v. Cookson*, 215 Ill. 2d 194, 204-05 (2005).

¶ 101   At issue are four statements in particular: each victim's initial outcry and VSI. A fifth statement challenged by defendant—S.F.'s statement to Detective Rodriguez—requires no discussion. As defendant acknowledges (in a footnote), the State did not use this statement at trial; thus, any error in the pre-trial ruling is necessarily harmless.

¶ 102   In most (though not all) respects, the trial testimony regarding the four outcry statements mirrored the testimony at the pre-trial hearing. And defendant's arguments that these statements were not sufficiently reliable to be admitted under section 115-10 largely replay his arguments (in the context of his sufficiency challenge) that the trial testimony was unworthy of belief by the

jury. The governing legal standard is different, but the analysis, in essentials, is the same: these statements were reliable enough to put in front of the jury for the same sorts of reasons that the jury was ultimately entitled to believe them. Many of defendant's arguments thus fail for the reasons we have already discussed. So rather than repeat our analysis point by point, we will limit our discussion to points that are newly raised or that bear further emphasis in this context.

¶ 103                              A. S.S.'s outcry statements

¶ 104    We begin with S.S.'s initial outcry to her father. As we have recognized time and again, a child's sense of fear, shame, guilt, embarrassment, or revulsion will often make it difficult, if not impossible, for the child to spontaneously discuss a traumatic experience involving sexual abuse or assault. A child's initial outcry—as Dr. Fujara also testified—is thus frequently delayed. In due course, the trier of fact may decide for itself how much weight an outcry statement deserves in light of any delay and its surrounding circumstances, but the sheer fact of a delay—here, of roughly two years—does not render a young child's initial outcry unreliable and thus inadmissible under section 115-10. *Zwart*, 151 Ill. 2d at 46; *People v. Cookson*, 335 Ill. App. 3d 786, 792 (2002); *People v. Booker*, 224 Ill. App. 3d 542, 554 (1992) ("Promptness in reporting the abuse is not an element of section 115-10.").

¶ 105    Similar forces are no doubt at work when a child, like S.S., at first tiptoes her way into a topic like this. So the fact that she later conveyed details about defendant's conduct in her VSI that she did not disclose to her father does not render either statement unreliable. And whatever details were admittedly lacking when S.S. first spoke out to her father, her statement was not too "vague" to be reliable. S.S. said that defendant "put his private in her private." Hesitant, guarded, perhaps a bit bashful, yes; but vague, no. The nature of the accusation is perfectly clear. And it was consistently repeated, with some elaboration, in S.S.'s later statements.

¶ 106    S.S.'s father testified by way of a brief stipulation at the pre-trial hearing. The stipulation, as defendant says, did not establish what he did in response to his daughter's outcry. But this point merits little if any weight in the trial court's reliability determination.

¶ 107    That brings us to S.S.'s VSI with Dr. Schoeneman-Parker. As we noted above, S.S. spoke of three separate incidents. In one of them, she said, defendant inserted his penis into her vagina, just as she initially disclosed to her father. That was the conduct for which defendant was charged and convicted. The details of the other alleged conduct, as revealed during the VSI, were admittedly unclear at times. For example, Dr. Schoeneman-Parker could not sort out when and where defendant allegedly inserted his finger into S.S.'s vagina. But the State did not charge defendant with this other alleged conduct and therefore did not use the VSI statements pertaining to it at trial. For this reason alone, any error in the admission of *these* statements is harmless. In other words, the only VSI statements presented at trial pertained to the charged assault. And we have already said enough about the alleged omissions and inconsistencies in S.S.'s statements about *this* conduct.

¶ 108    As a general matter, defendant says, the VSI statements "were the product of suggestive tactics." S.S. was uncooperative, at times hostile, and evidently "hardened" by her experiences. It was clear to Dr. Schoeneman-Parker that she did not want to be there. After the usual methods of building rapport failed, Dr. Schoeneman-Parker, in a last-ditch effort, offered up a deal: the faster S.S. answered questions, the faster she could leave. Dr. Schoeneman-Parker freely admitted that the method was unorthodox.

¶ 109    This method *induced* an otherwise reticent child to speak. But there is no evidence that it *suggested* any content of what she said. To the contrary, Dr. Schoeneman-Parker testified that in response to the deal she offered, S.S. rapidly "spewed out information," while Dr. Schoeneman-

Parker largely "stay[ed] out of the way and let her say what she wanted to say."

¶ 110   The most accurate record of a VSI is, of course, a video of the interview. Unfortunately, as Dr. Schoeneman-Parker testified, that was not the usual practice at the time, and the lack of a video does not mean that her testimony fails section 115-10's threshold reliability requirement.

¶ 111   It has long been a common practice for forensic interviewers to rely on interview notes when testifying, as Dr. Schoeneman-Parker did here. And those notes are commonly taken by a police officer, observing the interview from behind one-way glass. The obvious point is to allow the interviewer to fully engage with the child. (No small task here.) That doesn't make the notes unreliable. Nor does it impugn the testimony of the forensic interviewer who uses them to refresh her recollection. The same point applies to Aladeen's testimony regarding S.F.'s VSI.

¶ 112   True, the details of the VSI statements are in some ways "inconsistent with" the State's allegations in its section 115-10 motion. But a motion is not evidence—or, in appellate counsel's coy phrase, "other information in the record." A motion is a pleading. If its allegations conflict with the evidence, the motion might take a hit, but the evidence is not deemed unreliable on account of the conflict. We mention this frivolous argument if only because defendant advances it four times over, in the context of each victim's VSI, S.F.'s initial outcry, and S.F.'s statements to Detective Rodriguez (which were not used at trial). We will say nothing more about it.

¶ 113   Defendant was arrested after the VSI but released without being charged; thus, he says, the "inference to be drawn" is that the police and prosecutors had doubts about the reliability of S.S.'s outcries. For all sorts of reasons, charging decisions are not always as simple or immediate as this blunt argument demands. And not to belabor the obvious, but defendant was charged in due course; what inference was to be drawn from *that* decision? But even more to the point, the trial court's role is not to draw inferences from the judgments that law enforcement (purportedly)

made at one or another point in time; the trial court's role is to make up its *own* mind about the reliability of the evidence presented at the hearing.

¶ 114   Defendant's remaining arguments have been considered. None merit explicit discussion. S.S.'s initial outcry and VSI statements were properly admitted.

¶ 115                              B. S.F.'s outcry statements

¶ 116   S.F.'s initial outcry to her sister, L.M., was allegedly unreliable for two reasons (beyond those we have already discussed). First, defendant argues, "the picture L.M. painted of the family home" on the night of the assault calls her own testimony at the pre-trial hearing into question. As L.M. recalled, S.F. said that she was on the living-room couch when defendant climbed on top of her, and she only got away when defendant rolled off the couch and fell to the floor. (With a thud, defendant apparently presumes.) L.M. then heard the front door slam shut as defendant left the house. S.F. ran into their shared bedroom, crying hysterically, and passing their mother's room along the way. The other two siblings were home, too. Yet L.M. was the only one who heard anything. And that, defendant says, is unbelievable.

¶ 117   We don't agree. L.M. testified that it was past midnight, and she was only awake at this hour because she had homework to finish. As far as she knew, their mother was asleep in her bedroom with their younger sibling. She did not specifically testify about their older sibling's activities or whereabouts in the house, but given the late hour and L.M.'s testimony generally, it is a fair inference that L.M. was the only family member still awake. So it is not hard to believe that she was the only one who heard any of the assault or outcry.

¶ 118   Second, L.M. waited "a lot of months" to report S.F.'s allegations because she "wanted to be sure" that they were true. And she repeatedly asked S.F. if they were true. Thus, defendant says, L.M. must have doubted that they were. At least initially.

¶ 119   It is clear enough that L.M. initially found her sister's allegations hard to take. But that is not to say—and indeed L.M. never said—that she thought S.F. was either dishonest or somehow wildly mistaken. L.M.'s hesitation may reflect the shocking nature of the allegations as much as anything; surely no 14-year-old girl is eager to believe that the adult male in the house behaves like this. And in due course, L.M. *did* disclose the outcry to their mother. If she had any genuine doubts at the start, it would appear that she ultimately resolved them.

¶ 120   Defendant's argument here replays a now-familiar theme: someone learned of a victim's allegations but hesitated, for a time, before taking action. That hesitation can only be ascribed to skepticism about the veracity of the claims. The trial court should have found that (purported, initial) skepticism compelling. For the reasons we have already given, we reject that argument.

¶ 121   At her VSI, S.F. primarily spoke about the living-room assault; this was the only incident, according to Aladeen, that she described in any detail. But S.F. also revealed, for the first time, that defendant groped her breasts and buttocks on other occasions. Defendant argues that none of these VSI statements were reliable enough to be admissible. His arguments are variations on another familiar theme: S.F. either didn't tell L.M. what she later told Aladeen, or she told L.M. something a bit different. We have been over many of these points already, and many of the new ones are frankly too minor to warrant extended discussion. (What's more, the groping allegations pertain to the ACSA convictions, which merged at sentencing and thus are not a basis for relief at this juncture. So that discussion would be futile, anyway.)

¶ 122   There is one detail worth pausing over. According to Aladeen, S.F. said that she was 6 or 7 when defendant assaulted her in the living room; S.F. also said that she talked to L.M. about the assault when she was 8. This testimony would seem to imply that according to S.F. herself, there was no immediate outcry to L.M. at all.

¶ 123   There needn't be an immediate outcry at all. That said, we acknowledge that if S.F. and L.M. squarely disagreed on a point like this, we would have to wonder, at least a little, about *someone*'s reliability. But the implication we noted above is not as clear as it might seem at first blush. Aladeen testified (at the pre-trial hearing) that she never asked what S.F. did immediately after the living-room assault. So S.F. never denied that she ran to tell L.M., and more generally we don't know how S.F. would have answered that question, had it been posed directly. For her own part, L.M. said that she discussed the assault with S.F. not only on that night, but also on multiple occasions down the road. Which is all to say: there may no genuine conflict between S.F. and L.M. at all. The information gathered in the VSI was incomplete on this point, perhaps regrettably so; and we are mindful, as always, that a child like S.F. is all too prone to confusion when discussing points of chronology.

¶ 124   To be sure, all of this limits the evidentiary value of the VSI and may well lead a trier of fact to question how much weight the VSI statements deserve. But it goes too far to say that the statements were so unreliable that they should never have been placed in front of the jury.

¶ 125   The trial court did not abuse its discretion in admitting the outcry evidence, in any of its forms. So we find no error, much less reversible—and plain—error. And for the same reasons, defendant cannot establish that he was prejudiced by trial counsel's failure to preserve the issue. As a matter of trial court (plain) error or ineffective assistance, defendant's claim thus fails.

¶ 126                              III. Other-crimes evidence

¶ 127   The trial court allowed the State to "argue propensity in both directions for both victims." Thus, the evidence of defendant's conduct against S.S. could be used to show his propensity to commit similar conduct against S.F., and vice versa. Defendant argues (1) that the propensity use of the evidence was more prejudicial than probative, and that the trial court failed to conduct any

meaningful balancing inquiry; (2) that the State failed to provide adequate notice that the S.F.

evidence would be used to show propensity with respect to the S.S. charges; and (3) that the

evidence no longer qualified as *other*-crimes evidence once the charges were joined.

¶ 128                                      A. Undue prejudice

¶ 129   Section 115-7.3 of the Code of Criminal Procedure partially abrogates the common-law

ban against propensity evidence and thus allows other-crimes evidence to be admitted to show

propensity when the defendant is charged with one of the sex offenses enumerated in the statute.

725 ILCS 5/115-7.3(a)(1), (b) (West 2022); see *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

The probative value of the evidence must not be substantially outweighed by the risk of "undue"

prejudice. 725 ILCS 5/115-7.3(c); *People v. Walston*, 386 Ill. App. 3d 598, 611 (2008). The trial

court may consider the proximity in time, and degree of factual similarity, between the charged

and other alleged conduct, along with any other relevant facts and circumstances. 725 ILCS

5/115-7.3(c)(1)-(3). We review the ruling for an abuse of discretion. *Donoho*, 204 Ill. 2d at 182.

¶ 130   Defendant "does not dispute" that his conduct toward S.S. and S.F. was similar enough,

and close enough in time, for the evidence to have probative value on the question of propensity.

His claim is that its probative value was outweighed by its risk of undue prejudice.

¶ 131   As a preliminary matter, defendant says, the trial court failed to conduct this balancing

test. All that defendant is really entitled to say, however, is this: the trial court did not make a

*record* of any balancing it may have conducted. But it wasn't required to. *People v. Cummings*,

2023 IL App (1st) 220520, ¶ 36; *People v. Petrakis*, 2019 IL App (3d) 160399, ¶ 22. The trial

court's failure to explain the basis for its ruling on the record is not a ground for reversal.

¶ 132   In the usual case, where no statutory exception applies, other-crimes evidence is only

admissible for purposes *other than* propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). But the

admission of other-crimes evidence for a non-propensity purpose always carries a risk that the jury will draw an improper propensity inference. So in the usual case, when we speak of unfair or undue prejudice from the admission of other-crimes evidence, this risk is one of the principal factors that we have in mind.

¶ 133   But that cannot be what "undue prejudice" means in the context of section 115-7.3, since the whole point of the statute is to *permit* the propensity inference that is ordinarily the source of prejudice. Thus, when other-crimes evidence is admitted to show propensity under section 115-7.3, there is far less risk of unfair or undue prejudice. *Walston*, 386 Ill. App. 3d at 619-20; *People v. Perez*, 2012 IL App (2d) 100865, ¶¶ 48-50; *People v. Watts*, 2022 IL App (4th) 210590, ¶ 60.

¶ 134   As a result, the "limits" on the trial court's admission of propensity evidence under this section are "relatively modest." *Walston*, 386 Ill. App. 3d at 621. Not anything goes; the statute itself clearly contemplates that the use of propensity evidence in a sex-crime case can, at some point, cross the line into undue prejudice. But such cases will be rare exceptions, not the general rule. And whatever risk of undue prejudice the defendant claims, it must be something more than just the likelihood that the jury will draw a propensity inference.

¶ 135   Much of defendant's argument is that the State did, indeed, argue propensity inferences to the jury. Beyond this general point, which will not establish undue prejudice, he argues that the State's use of propensity inferences created "a form of circular reasoning" that "diminish[ed] the burden of proof." Specifically, the jury could have used the propensity evidence to convict defendant of the offenses against both S.S. and S.F., even if it found "fatal weaknesses" in the State's proofs when considering each "in isolation" from the other.

¶ 136   For the sake of parsing this argument, let's put aside, for now, that fact that the State was allowed to argue propensity "in both directions." Let's consider the jury as deliberating, say, on

the S.S. charges, and thus considering the proof of defendant's conduct against S.F. as propensity evidence. If the jury found this proof credible, it could infer that defendant was more likely to commit the similar conduct that he was charged with committing against S.S. It should thus be obvious that the jury did not need to decide whether defendant was guilty of the S.S. charges "in isolation" from the proof of his conduct toward S.F. That purported requirement would nullify the propensity inference that section 115-7.3 authorizes the jury to draw.

¶ 137   And suppose, further, that the jury's finding of guilt on the S.S. charges relied critically on the propensity inference; without it, the State's proof would have fallen somewhat short on the reasonable-doubt standard. Without more, this still wouldn't show that the burden of proof was diminished; it would simply show that the State offered relevant, admissible evidence in partial satisfaction of that burden. The key question is whether the jury found that the charges were proven beyond a reasonable doubt when any permissible propensity inferences were *considered*, not when they were *ignored*.

¶ 138   It is not hard to imagine a case in which the direct evidence of the charged conduct has serious weaknesses, and so the State piles on a wildly excessive amount of propensity evidence, in an apparent effort to bamboozle the jury into convicting the defendant primarily on the basis of the uncharged conduct. Such were the "extreme" facts that led to a finding of undue prejudice in *People v. Cardamone*, 381 Ill. App. 3d 462, 494 (2008), cited here by defendant. See *Perez*, 2012 IL App (2d) 100865, ¶ 49; *Watts*, 2022 IL App (4th) 210590, ¶ 57. But this case is not at all similar to *Cardamone*.

¶ 139   Everything we have said about a jury's deliberations on the S.S. charges applies equally to deliberation on the S.F. charges. Thus, if the charges were tried separately, each jury could draw one of the two propensity inferences that the jury was allowed to draw here; the State's

burden would not be diminished in either case, and there would be no viable claim of undue prejudice. So defendant's argument must be this: allowing propensity inferences "in both directions" *at once* created "circular reasoning" that diminished the burden of proof and in this way caused him undue prejudice.

¶ 140    This sounds more like a consequence of the joinder than a reason to find error in the trial court's admission of propensity evidence. But that aside, we don't agree that the deliberations were rendered "circular" at all, for the reasons we discussed above, in the context of defendant's sufficiency challenge. As we explained there, two complete strangers independently accused defendant, under oath, of conduct that was notably similar in key respects: the victims' ages; their relations to defendant; and the escalating pattern of conduct, starting with the same lap-bouncing routine and culminating in a sleeping victim awaking, late at night, to find a drunk defendant inserting either his penis or his finger between her labia.

¶ 141    In light of this evidence, a jury could find it more likely that *both* victims were telling the truth—rather than wandering into an extraordinary coincidence—and that defendant is in fact prone to such conduct. In this way, the S.S. and S.F. evidence was mutually (albeit indirectly) corroborating, and the jury could consider this mutual corroboration in deciding whether the State carried its burden of proof on each set of charges. As long as the jury found that the proof, in each instance, was beyond a reasonable doubt, the deliberations were not "circular," the burden of proof was not diminished, and defendant suffered no undue prejudice.

¶ 142    We appreciate that defendant's stalking horse in this argument—the demand for separate consideration of each set of charges—does not come out of left field. In the usual case, separate charges joined for trial *do* demand entirely separate consideration. (Many jurisdictions, our local federal circuit among them, instruct the jury on this point. See The William J. Bauer Pattern

Criminal Jury Instructions, No. 4.06 (2020 ed.). We note that the IPI has no such instruction.) But that is because the evidence on one charge is usually not admissible as propensity evidence on another charge. Here, it was. Defendant has not shown undue prejudice.

¶ 143                                    B. Notice

¶ 144   In February 2014, before the cases were joined, the trial court granted the State's motion to admit proof of defendant's sexual abuse and assault of S.S. as propensity evidence in the S.F. case. The cases were joined in May 2014, and the trial began in September 2015. On the first morning of trial, right before jury selection was set to begin, the State asked the court to "double check" its ruling on the other-crimes motion. Specifically, the State "wanted to make sure" that, in light of the intervening joinder, it would now be allowed to "argue propensity in both directions for both victims." The defense objected that the request should have been made long ago and was now untimely. The trial court disagreed and granted the State's request. Defendant argues that this ruling was error.

¶ 145   When the State intends to offer evidence under section 115-7.3, "it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown." 725 ILCS 5/115-7.3(d) (West 2022).

¶ 146   In *People v. Valdez*, 2022 IL App (1st) 181463, ¶¶ 71-85, we construed the disclosure provision in the related statute that governs the admission of other-acts evidence in domestic-violence cases. See 725 ILCS 5/115-7.4(c) (West 2022). And we relied on our supreme court's decision in *People v. Peterson*, 2017 IL 120331, ¶¶ 117-129, which construed the disclosure provision that applies to the admission of other-acts evidence under Illinois Rule of Evidence 404(c) (eff. Jan. 1, 2011). As we noted in *Valdez*, 2022 IL App (1st) 181463, ¶ 75, all three

disclosure provisions are identical; thus, there is no reason to interpret them any differently, and precedents construing the three provisions are interchangeable for this purpose.

¶ 147   *Peterson* and *Valdez* establish two points. First, it is not enough for the State to disclose the evidence itself; it must also disclose its intent to offer the evidence as other-crimes evidence, for a particular stated purpose. *Peterson*, 2017 IL 120331, ¶¶ 117-121; *Valdez*, 2022 IL App (1st) 181463, ¶¶ 74-83. Second, to be entitled to relief, defendant must show how the State's failure to provide pre-trial notice (or to show good cause for the failure) prejudiced his ability to defend against the State's use of the evidence. *Peterson*, 2017 IL 120331, ¶ 128; *Valdez*, 2022 IL App (1st) 181463, ¶ 85.

¶ 148   Obviously enough, the evidence of defendant's conduct toward both S.S. and S.F. was disclosed to the defense. But in the pre-trial motion, the State only disclosed its intent to use the S.S. evidence to show propensity with respect to the S.F. charges. It did not disclose its intent to use the evidence the other way around until the first day of the trial. The State had more than a year, since the charges were joined, to clarify this point. It has not shown good cause for its failure to do so. The State did not comply with the pre-trial disclosure provision.

¶ 149   But defendant cannot show how this lack of pre-trial disclosure prejudiced his ability to defend against the State's use of the S.F. evidence to show propensity. Nor does he even try. The S.S. evidence was admitted to show propensity because the relevant conduct was close enough in time, and similar enough in fact, to have probative value with respect to S.F. charges. See 725 ILCS 5/115-7.3(c)(1)-(3) (West 2022).

¶ 150   It follows, as a matter of basic logic, that the S.F. evidence was exactly as probative with respect to the S.S. charges—and for exactly the same reasons. No matter which "direction" the State would argue in, its propensity arguments would be the same: defendant's alleged conduct

toward the two victims was close enough in time, and similar enough in fact, that evidence supporting one set of allegations was probative with respect to the other. The defense's responses (if any) would also be the same: the incidents were too remote in time, or different enough on their facts, to be probative in this way. Turning the inference around did not give rise to any new arguments that the defense did not already have to prepare for, in light of the ruling on the other-crimes motion.

¶ 151   Thus, if counsel was prepared to defend against the State's use of the S.S. evidence to show propensity, counsel would have been equally prepared to defend against the State's use of the S.F. evidence for the same purpose. While all intended uses of other-crimes evidence should be settled in advance of trial, and not as the venire is knocking on the courtroom door, the last-minute ruling here did not prejudice the defense.

¶ 152                    C. Effect of joinder on other-crimes evidence

¶ 153   Defendant argues that once the S.S. and S.F. cases were joined for trial, neither victim's testimony qualified as other-crimes evidence in the first place. The law, he says, "implicit[ly]" limits other-crimes (or bad acts) evidence to *uncharged* conduct. But once the cases were joined, all of the evidence involved *charged* conduct for which defendant was on trial. Thus, the State now had to forego any propensity (or more generally, other-crimes) use of its evidence.

¶ 154   The question is not what premises are supposedly "implicit" in the law of other-crimes evidence in general. The question is what the controlling statute actually says. Which is this: "If the defendant is accused of an [enumerated offense], evidence of the defendant's commission of another [enumerated offense or offenses] * * * may be admissible" and considered for any relevant purpose. 725 ILCS 5/115-7.3(b) (West 2022).

¶ 155   For example: PCSA is an enumerated offense *Id.* § 115-7.3(a)(1). Defendant was accused

of committing PCSA against S.S. To show his propensity to commit this offense, the State could offer evidence that he committed "another" enumerated offense. Defendant allegedly committed PCSA against S.F., and the State surely had evidence to this effect. Thus, the State could use that evidence to show propensity. We could have S.S. and S.F. switch places, or substitute ACSA for PCSA as the enumerated offense, all with the same result. The point being: the statute allows for the use of "evidence of * * * *another*" enumerated offense. (Emphasis added.) *Id.* § 115-7.3(b). It does not say that this offense must be uncharged—or, if charged, separately tried.

¶ 156   Defendant reads into the statute an "implicit" limitation that does not exist. He does so by quoting general statements to the effect that "[o]ther-crimes evidence encompasses misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is standing trial." *E.g.*, *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 61.

¶ 157   In the typical case, that is a fair description. But we are not convinced that such general statements (in *Johnson* or other similar cases) are intended to preclude the State from using the proof of one charged offense as other-crimes evidence with respect to another charged offense. Such general statements, which typically address Rule 404(b) or its common-law antecedents, simply do not contemplate the rare scenario in which this possibility might arise outside of the context of statutory exceptions like section 115-7.3. (If there are cases directly addressing that issue, defendant has not cited them.) Even less are these general statements meant to impose a limitation on a statute that was never at issue.

¶ 158   Since defendant has not shown any error in the use of the other-crimes evidence, we need not consider his plain-error or ineffective-assistance arguments.

¶ 159                                        IV. Misjoinder

¶ 160   After the trial court granted the State's section 115-10 and other-crimes motions (in the

S.F. case), the State moved to join the S.S. and S.F. charges for trial. Notably, shortly after the two evidentiary motions were granted, counsel told the court, at a status hearing, that the defense was contemplating a joinder motion. But the State beat it to the punch.

¶ 161   When the State's joinder motion came up for consideration, counsel stated on the record that the defense had no objection. But more than that, in light of the rulings on the evidentiary motions, joinder was now part of the "defense strategy." (And it served "judicial economy" to boot.) Counsel discussed the "pros and cons" of joinder with defendant, who acknowledged, in open court, that he agreed with counsel's determination.

¶ 162   Defendant argues on appeal that the joinder, to which he agreed, was error. Since there was obviously no objection, he alleges first-prong plain error and ineffective assistance.

¶ 163   Plain-error review is not appropriate here. The defense did not just fail to object to any alleged misjoinder. The defense affirmatively agreed to the joinder, and counsel represented to the trial court that joinder was now a matter of "defense strategy." (So much so that counsel was considering a joinder motion when the State filed one of its own.) Defendant cannot argue on appeal that a ruling to which he expressly agreed was trial-court error. See *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001) ("invited error" doctrine precludes this tactic).

¶ 164   And our cases have long held that the trial court may join charges if the defense agrees to it, even though the statutory criteria for joinder are not satisfied. *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 58; *People v. Marts*, 266 Ill. App. 3d 531, 542 (1994); *People v. House*, 202 Ill. App. 3d 893, 907 (1990); *People v. Benka*, 117 Ill. App. 3d 221, 223 (1983). The defense, in other words, may affirmatively waive—as opposed to merely forfeit—any claim of misjoinder. As it did here.

¶ 165   But neither an express waiver nor an invitation to error, so to speak, precludes a claim of

ineffective assistance. See *Villarreal*, 198 Ill. 2d at 228. Counsel's agreement to the joinder may have been the result of deficient performance. By the same token, defendant's own agreement to the joinder may have been the result of deficient advice from counsel. We thus review his claim under the deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 166    When possible, a reviewing court may deny a *Strickland* claim based on the absence of prejudice, without deciding whether counsel's representation was deficient. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000). We will do so here. Whatever strategic reasons counsel perceived for agreeing to the joinder—and the record predictably fails to disclose them—we remain confident in the verdicts that the jury returned on the joined charges. We find no reasonable probability that separate trials would have yielded any different outcomes. See *People v. Johnson*, 2013 IL App (2d) 110535, ¶¶ 57-58.

¶ 167    We have often noted that a misjoinder is harmless if "the evidence of all the charged crimes would have been admissible in the separate trials that would have taken place if not for the misjoinder." *People v. Walston*, 386 Ill. App. 3d 598, 609 (2008). This same principle guides our *Strickland* analysis: if the same evidence would have been admitted at separate trials, then counsel's agreement to the joinder (or *mis*joinder, as the case may be) was not prejudicial.

¶ 168    For the reasons we have already discussed, the testimony of the victims, S.S. and S.F., was properly admitted as propensity evidence. Thus, at a trial in the S.S. case, S.F. could testify about the incidents of her own sexual abuse and assault, and vice versa. Defendant concedes as much in his brief. And the named victim's own outcries, obviously enough, would be admissible at a trial in that victim's case. The only difference between a joint trial and separate trials is this: at each separate trial, the outcry statements of the propensity witness would not be admissible.

¶ 169    Propensity evidence in a sex-offense case must be "otherwise admissible under the rules

of evidence." 725 ILCS 5/115-7.3(b) (West 2022). Outcry statements are hearsay, so they are admissible only if a hearsay exception applies. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Section 115-10, the primary exception for outcry statements, only applies to the outcry statements of the victim(s) of the charged offense(s), and not to those of a section 115-7.3 propensity witness. *People v. Hayden*, 2018 IL App (4th) 160035, ¶¶ 109-126. Thus, for a propensity witness, the State must show that another hearsay exception applies. But the State has not relied on any hearsay exceptions in this case other than section 115-10.

¶ 170   (We note that Justice Steigmann thoughtfully dissented in *Hayden*. But the only case to consider the question after *Hayden* sided with the majority. *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 35. In any event, given the facts of this case, we don't think that *Hayden* compels a finding of prejudice. So we have the luxury of staying above the fray.)

¶ 171   Separate trials would thus proceed as follows. In the S.S. case, S.F. could testify about her own sexual abuse and assault, but she could not testify about her out-of-court statements to L.M. or her VSI statements to Aladeen. Nor could those witnesses testify about the statements S.F. made to them. Similarly, in the S.F. case, S.S. could testify about her own sexual abuse and assault, but her statements to her father and her VSI statements to Dr. Schoeneman-Parker would not be admissible. Joinder of the charges, defendant argues, thus introduced a substantial amount of otherwise inadmissible hearsay that "bolstered each complainant's weak testimony."

¶ 172   The use of the word "complainant" in this context creates an impression that the joinder allowed "each complainant's testimony" to be "bolstered" in a way that it would never have been bolstered had the charges been tried separately. That impression is misleading. The State could have fully availed itself of any bolstering value, so to speak, that each "complainant's" outcry statements offered when that "complainant" testified as the victim of the charged offenses. It is

only when that "complainant" testified as a propensity witness, at a separate trial in the other "complainant's" case, that her outcry statements could not have been used to bolster her (other-crimes) testimony.

¶ 173   The question, then, is how much the State had to gain from this limited bolstering. Not much, in our view. Recall what separate trials would look like: the victim would take the stand and tell the story of her sexual abuse and assault at defendant's hands. Her outcry statements, for whatever they were worth, would be laid out in full detail. A complete stranger would then take the stand and tell the story of how she was sexually abused and assaulted by defendant, when she was of a similar age and relation to defendant as the victim. And their stories would share an unnervingly similar narrative arc, one that begins with the same lap-bouncing routine and progresses over time to vaginal penetration.

¶ 174   The probative value of the propensity evidence derives, overwhelmingly, from the ability of two complete strangers to independently confirm a repeating pattern of conduct by defendant. That probative value would not have been diminished at separate trials. If anything, the probative commonalities between their stories would have been presented even more starkly, without the defense chipping away at them through impeachments that the joinder made possible.

¶ 175   Here's what we mean by that. We grant defendant that admitting the outcry statements of a propensity witness had some tendency to bolster that witness's credibility. But this evidence also expanded the scope of impeachments that the defense could readily pursue. Without the outcry statements in evidence, counsel would have been limited to whatever impeachments may have been possible under the prior-inconsistent-statement rule. See 725 ILCS 5/115-10.1 (West 2022). We will not attempt to enumerate those possibilities here. Suffice it to say there would have been far fewer opportunities to attack the credibility of the propensity witness.

¶ 176   And those attacks were a key element of the defense strategy. Counsel sought to make hay out of the delays in informing a concerned adult, the various omissions and disparities in detail in the statements over time, the differences in S.F.'s and L.M.'s recollections of the night of the assault, the procedural irregularities in S.S.'s VSI, and other topics that we have discussed.

¶ 177   One might note that if a propensity witness's outcry statements were not in evidence, these impeachments would not have been necessary. True, but the impeachments also afforded counsel more ammunition to cast doubt on the veracity of the accusations against defendant. The jury did not find those reasons for doubt compelling, and neither do we. But at separate trials, there would have been *fewer* reasons of this kind to offer. The testimony of each propensity witness, in all of its stark and probative detail, would have stood largely unimpeached.

¶ 178   Admitting the propensity witness's outcry statements thus cut both ways: the evidence had bolstering value for the State *and* impeachment value for the defense. (Counsel's "pros and cons" to joinder?) We need not conclude that these countervailing effects were a wash, though that is probably the truth, or at least close to it. Even if the evidence somewhat favored the State, on balance, the effect was clearly not enough to swing any of the verdicts in its favor.

¶ 179   We emphasize that our ruling is narrow and fact-bound. It is not hard to imagine a case in which a misjoinder, or counsel's agreement to a joinder, proves to be prejudicial. For instance, a propensity witness's allegations might seem incredible on their face, but the outcry evidence improperly introduced at a joint trial might go a long way toward alleviating the first-blush qualms about their credibility. That is how the *Hayden* majority viewed the facts of its case. See *Hayden*, 2018 IL App (4th) 160035, ¶ 134.

¶ 180   But we don't see our own facts in that light. Putting aside the outcry evidence, neither S.S.'s nor S.F.'s story is inherently unbelievable, and considering them side by side makes it that

much harder to believe that either one of them was spun out of whole cloth or somehow wildly mistaken. And far from being straightforwardly corroborative, the outcry evidence was a mixed bag—offering the State some corroborative value, to be sure, but also introducing many of the "inconsistencies" on which the defense has always sought to capitalize. In these circumstances, defendant was not prejudiced by the joinder.

¶ 181   One last point. We have sidestepped the question, addressed at some length in the briefs, whether the statutory criteria for joinder were satisfied. See 725 ILCS 5/111-4(a), 114-7, 114-8 (West 2022). This is a complex issue on which the appellate cases have sharply disagreed. The basic fault line is exemplified by the trenchant disagreement between the majority and concurrence in *Walston*, 386 Ill. App. 3d 598. We do not mean to suggest that the issue of joinder demands anything less than careful scrutiny in both the trial and appellate courts, and we caution that our decision today should not be read "as an invitation to overlook the joinder statute on the ground that even a misjoinder will not lead to reversal." *Id.* at 623. But the defense agreed to the joinder below, as it was entitled to do, subject to ineffectiveness review. That defense tactic, and the availability of a narrow ground of decision, leads us to conclude that the complexities of this topic are best left for another day.

¶ 182                           V. Other alleged trial errors

¶ 183   Defendant alleges three additional points of trial-court error and "pervasive" misconduct by the prosecutors. We can dispose of these claims relatively quickly.

¶ 184                           A. Dr. Fujara's testimony

¶ 185   First, defendant argues that the trial court erred in allowing Dr. Fujara to testify about one topic: the phenomenon of delayed outcry by children who are victims of sexual abuse or assault, particularly at the hands of familial or other close relations.

- 43 -

¶ 186   Defendant claims that Dr. Fujara's testimony did not comply with *People v. Butler*, 377 Ill. App. 3d 1050, 1064-65 (2007), which supposedly holds that expert testimony on this topic is admissible only in a "limited, narrow set of circumstances," namely, where there is factual support for the expert's opinion in the lay witnesses' testimony; the expert has not spoken with the victim or made a determination about the victim's credibility; and the expert testifies in the State's rebuttal case, not its case-in-chief.

¶ 187   Defendant misreads *Butler*. Of course there must be factual support for an expert opinion. But beyond that, *Butler* merely reiterated that expert testimony must not "constitute improper commentary on the credibility" of the victim or another witness. *Id.* at 1064.

¶ 188   To this end, *Butler* cited the remaining "circumstances" on defendant's list as factors that supported the admissibility of the expert's testimony and, more specifically, distinguished the case from *People v. Simpkins*, 297 Ill. App. 3d 668 (1998), the facts of which are too far afield from our own to bear much discussion. The point is that *Butler* never purported to harden these factors into rules of evidence, and defendant cites no other authority that does.

¶ 189   True, Dr. Fujara spoke to S.F.—though not to S.S.—during the medical exam. Unlike the psychologist in *Butler*, Dr. Fujara did not expressly deny that she formed an opinion as to S.F.'s credibility. But if she formed any such opinion, she never told the jury what it was; she did make clear, however, that she did not delve into the particulars of S.F.'s allegations during the exam. (Thus suggesting her neutrality.) So Dr. Fujara's testimony can hardly be called an "improper commentary on the credibility" of either victim. And if her testimony was relevant and helpful, insofar as there was evidence of one or more delayed outcries, we see no reason why the State could not offer the testimony in its case in chief.

¶ 190   To the extent that S.S.'s outcry was delayed, Dr. Fujara's testimony had a factual basis in

the evidence and was thus relevant and helpful to the jury. As defendant points out, S.F's initial outcry (to her sister) was immediate, not delayed. To that extent, Dr. Fujara's testimony was not relevant. But it didn't have to be relevant to both victims' outcries to be admissible. And since the evidence showed that S.F.'s outcry was not delayed, Dr. Fujara's testimony that delayed outcries are a matter of course did not improperly bolster S.F.'s credibility. Thus, her testimony had at least some relevance, and it was not prejudicial to the defense at all.

¶ 191                              B. Pattern instruction 11.66

¶ 192    IPI 11.66 should be given whenever section 115-10 outcry statements are admitted into evidence. 725 ILCS 5/115-10(c) (West 2022); Illinois Pattern Jury Instructions, Criminal No. 11.66 (4th ed. 2000); *People v. Sargeant*, 239 Ill. 2d 166, 190. That instruction was not given here. The State concedes the error, and we appreciate and accept the concession. The question is whether this unpreserved error warrants reversal under a theory of plain error or ineffective assistance.

¶ 193    While trial courts have no discretion to omit IPI 11.66 when the instruction is called for, the error will frequently, if not usually, be deemed harmless—at least when IPI 1.02, the similar, though more general, instruction on witness believability, is given. *Sargeant*, 239 Ill. 2d at 192-94; see also *People v. Marcos*, 2013 IL App (1st) 111040, ¶¶ 68-73; *People v. Richmond*, 341 Ill. App. 3d 39, 50 (2003); *People v. Booker*, 224 Ill. App. 3d 542, 556 (1992).

¶ 194    IPI 11.66 provides tailored guidance for the jury in deciding whether a child's outcry statement is credible, and how much (if any) weight the statement deserves: the jury should consider the age and maturity of the child, along with the nature and circumstances of the statement. Illinois Pattern Jury Instructions, Criminal No. 11.66 (4th ed. 2000).

¶ 195    IPI 1.02 provides guidance in assessing the believability of a witness in general: the jury

- 45 -

may consider "his ability and opportunity to observe, [his age,] his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case." Illinois Pattern Jury Instructions, Criminal No. 1.02 (4th ed. 2000).

¶ 196    Linguistic differences aside, these two instructions "convey similar principles regarding the jury's role in assessing witness credibility and the various criteria jurors may consider when making that assessment." *Sargeant*, 239 Ill. 2d at 192. This is especially true when the optional, bracketed factor of "age" is included in the version of IPI 1.02 given to the jury, though, unlike in *Sargeant*, that did not happen here.

¶ 197    Even still, it is hard to imagine that a reasonable juror, abiding by the principles set forth in IPI 1.02, would fail to grasp that the age and maturity of a *child* declarant are key factors in assessing his or her ability to accurately observe and recount the events in question. This is not to deny that the obvious sometimes bears emphasis, and IPI 11.66 should be used for that intended purpose—especially when the believability of an outcry statement is a likely focal point of deliberations. But barring that (or some other unusual) circumstance, the use of IPI 1.02 in its stead will not necessarily undermine our confidence in the verdict.

¶ 198    The only case cited by defendant in which this error led to reversal is *People v. Mitchell*, 155 Ill. 2d 344 (1993). But *Mitchell* was an unusual case, in that the failure to give IPI 11.66 was embedded in a larger pattern of error. The trial court's "more fundamental failure" in *Mitchell* was admitting the outcry evidence without conducting the evidentiary hearing necessary (and so required by section 115-10) to determine the reliability of this hearsay evidence. *Id.* at 354; see *Sargeant*, 239 Ill. 2d at 193. The combination of this error and the "serious contradictions" on the face of the victim's trial testimony heightened the "prejudicial" effect of the outcry evidence,

which in turn heightened the need for the tailored instructions set forth in IPI 11.66. *Mitchell*, 155 Ill. 2d at 354-55. And it was against this backdrop that our supreme court found the evidence in *Mitchell* closely balanced enough to warrant reversal on a theory of plain error. *Id.*

¶ 199   That pattern of compounding errors is not present here. Still, defendant says, the evidence was closely balanced, and thus the instructional error alone may have swung the verdicts against him. See *Sargeant*, 239 Ill. 2d at 189. (Strictly speaking, defendant's claim arises under Illinois Supreme Court Rule 451(c), but that rule is "coextensive" with the plain-error rule, so we will stick with this terminology. *Id.*; see 177 Ill.2d R. 451(c).) His *Strickland* prejudice arguments are, necessarily, to the same effect. See, *e.g.*, *People v. White*, 2011 IL 109689, ¶ 133.

¶ 200   Defendant asserts, without qualification, that "[w]hen a conviction necessarily involves determining issues of credibility, the evidence is closely balanced." He attributes this overbroad proposition to *People v. Sebby*, 2017 IL 119445, ¶¶ 60-63, but our supreme court said no such thing. In one fell swoop, defendant indiscriminately renders most cases closely balanced—and thus robs the term of any real meaning—since "determining issues of credibility" is the jury's stock in trade, a function it is routinely, almost inevitably, called upon to perform.

¶ 201   And even when a case boils down to "the prosecution witnesses say this, the defense witnesses say that," it still doesn't follow, as a matter of necessity, that the evidence is closely balanced. One side's story might make little (or no) sense. The evidence in *Sebby* was closely balanced not because the jury had to choose between competing accounts, but because the competing accounts on offer were both internally consistent and plausible, and "clouded" by only "[m]inor inconsistencies" to a similar extent. *Id.* ¶ 61.

¶ 202   This case was not a close credibility contest in the mold of *Sebby*. For one, there were no competing accounts on offer; there was only the State's version of events. To call the evidence

"closely balanced" in a one-sided presentation like this is to say that the outcry statements were critical to the State's case because its evidence was otherwise weak. The credibility of the outcry statements would thus become a key question for the jury, one on which the verdict(s) could very well turn. That's the *Mitchell* case, in a nutshell, if we put aside the compounding error of failing to hold a section 115-10 hearing.

¶ 203   But it's not *this* case. Neither victim's trial testimony was inherently incredible or internally contradictory. And when their stories are heard together, it becomes mountingly difficult to dismiss either one as fabrication or error. The victims were mutually, if indirectly, corroborating; that is the effect of the propensity inference that the jury was permitted to draw. The facially plausible testimony of two unrelated victims, bolstered by this inference, adds up to a reasonably strong case for the State.

¶ 204   The outcry evidence, to the extent it was bolstering, added some further probative value for the State. But that value was limited, and, in the ways we described above, the defense made liberal use of the perceived impeachment value of this evidence as part of its own strategy. More than the outcry evidence, it was the propensity inference that bolstered each victim's testimony and credibility. That was the heart of the State's case. All things considered, the evidence was not closely balanced, such that an IPI 11.66 instruction might have changed any of the verdicts.

¶ 205                          C. Judge's comment on defendant's absence

¶ 206   In its introductory remarks to the prospective jurors, the trial court addressed the elephant in the room, defendant's absence from his own trial: "Also on an earlier date, I made a finding that the defendant had willfully absented himself from trial and this is why we are proceeding today in his absence."

¶ 207   Defendant argues that this remark was error. The State is reluctant to concede the error, but it also does not seriously contest that it was error. And (unpreserved) error it was. The only question is whether it warrants reversal, on a theory of first-prong plain error or ineffective assistance.

¶ 208   To be clear, it is proper for the trial court to preemptively address a defendant's absence from trial, in an effort to forestall any speculation from the jurors that the State might be taking unfair advantage of the defendant by having him tried in his absence. *People v. Brown*, 172 Ill. App. 3d 1044, 1047 (1988). But the court's remarks should remain neutral about the reasons for, and the "willfulness" of, the defendant's absence. *Id.* To the extent that these reasons are thought to be probative on the question of "consciousness of guilt," they should be presented to the jury by the prosecution; the trial court should not allow the considerable weight its own word carries with the jury to color the issue from the start. *Id.*; see also *People v. McDonald*, 227 Ill. App. 3d 92, 95 (1992). And of course, whatever the prosecution might introduce on this subject would be subject to Rule 403 balancing by the court.

¶ 209   The trial court's comment was error, but it does not warrant reversal. This case was not an especially close one, for reasons already given. We are confident that the jury convicted defendant based on the proof of his conduct toward S.S. and S.F. So we are confident that the jury would have convicted him, anyway, if the trial court had not improperly announced its finding that his absence from court was willful.

¶ 210                              D. Prosecutorial misconduct

¶ 211   Defendant's last claim of trial error is "pervasive" prosecutorial misconduct throughout opening statement, closing and rebuttal argument, and the introduction of evidence. Since none

of the alleged instances of misconduct met with a defense objection at trial, defendant claims first- and second-prong plain error and, in the alternative, ineffective assistance.

¶ 212    To begin, we find no merit in defendant's argument that the State committed misconduct by introducing three benign photographs depicting S.S. and S.F. as the children they were at the time of the charged conduct. (One was S.S.'s first-grade school photo; the others were of S.F., at the ages of 5 or 6, and 8 or 9.) Because S.S. and S.F. were, respectively, 26 and 17 years of age when they testified, these photos served a legitimate demonstrative purpose.

¶ 213    The victim's age is an element of the PCSA and ACSA offenses with which defendant was charged. 720 ILCS 5/12-14.1(1), renumbered as 720 ILCS 5/11-1.40(a)(1) by P.A. 96-1551 (eff. July 1, 2011); 720 ILCS 5/12-6, renumbered as 720 ILCS 5/11-1.60 by P.A. 96-1551 (eff. July 1, 2011). Thus, we cannot agree that the State improperly harped on S.S.'s and S.F.'s ages in a bald attempt to garner sympathy or otherwise inflame the jury. The childhood photos were proper, as were the various remarks that highlighted their ages throughout the State's opening, closing, and rebuttal. We see no need to catalog those remarks at this juncture.

¶ 214    Defendant objects to several other (at times overlapping) themes woven throughout the State's presentations to the jury. For example, he says, the State portrayed the case as a "contest between good and evil"—not overtly, but by branding him as a "predator," who thus "preyed" on the victims, and as a "coward."

¶ 215    Unlike in *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 109, cited in the opening brief, defendant was charged with *predatory* criminal sexual assault. Minor linguistic variants of the name of the charged offense can hardly be deemed misconduct. And the term "coward" was a reference to defendant's failure to appear for his own trial: his lack of "courage," that is, to face the charges, the victims, and the jury. References to the "empty chair" next to counsel were in

the same vein. To the extent that defendant's absence was properly at issue—a point he never disputes—this was a fair argument, albeit one couched in occasionally hard-hitting language.

¶ 216   Commenting on defendant's absence and apparent flight, the State concluded its opening with this rhetorical flourish: "But you know what. Justice is patient. It waits. And it has arrived in the form of your guilty verdict." The comment was premature and better left until closing (or rebuttal) argument. But we cannot imagine that the jury was misled into thinking that its verdicts were already a *fait accompli* and hence that there was no need to maintain an open mind and the presumption of innocence until the all the evidence was in.

¶ 217   Defendant objects to the State's use of "sarcasm" in rebuttal, but "[c]ountless cases have reiterated that the use of mild sarcasm or invective is not misconduct, that reviewing courts do not act as the 'speech police' in reviewing closing arguments, and that unflattering 'appellations' are not improper where they are supported by the evidence or a reasonable inference from the evidence." (Citations omitted.) *People v. Potts*, 2021 IL App (1st) 161219, ¶ 291.

¶ 218   It was sarcastic, indeed, but not misconduct, for the prosecutor to remark that there is "no textbook * * * for first graders * * * that says, 'This is what you should do if someone tries to rape you in the middle of the night. Turn to Page 12." Putting aside the use of the word "rape," to which we will return, the remark was in the service of a fair argument that "[l]ittle girls are not equipped to handle anything like this." Nor was it out of bounds for the prosecutor to argue that "[c]hild molesters pick children because they're easy targets," who often "don't even know how old they are."

¶ 219   While there is no textbook for first-graders, the State continued, "there is a textbook on pedophiles and their behavior, and this defendant fits that classic textbook definition to a 'T'." In defendant's view, this remark was improper, because "[n]o such definition or textbook" was ever

"introduced as evidence at trial." The objection is literal-minded to an unreasonable degree. The very next sentence of the prosecutor's argument made clear that the reference was to Dr. Fujara's expert testimony on the subject of grooming, and the substance of the argument was that defendant's escalating conduct was, so to speak, a "textbook" example of the phenomenon. This common idiom was not misconduct.

¶ 220   The same point applies to the State's characterization of a "child molester" as someone "with a sick head." The remark may have been intemperate, but it's not much of an objection to point out that "there was no evidence presented that [defendant] suffered from a mental illness." That wasn't the point. The remark was not tantamount to "unsworn testimony" by the prosecutor. See *People v. Watson*, 94 Ill. App. 3d 550, 557 (1981).

¶ 221   Defendant claims that the State "mischaracterized the applicable law" when it repeatedly described the conduct underlying the PCSA charges—namely, sexual penetration—as "rape." Section 115-11.1 of the Code of Criminal Procedure specifically provides that "[t]he use of the word 'rape', 'rapist', or any derivative of 'rape' by any * * * State's attorney * * * in any prosecutions of offenses in Sections 11-1.20 through 11-1.60 or 12-13 through 12-16 of the Criminal Code of 1961 or the Criminal Code of 2012 is not inadmissible."

¶ 222   That section applies to the offenses charged here. Of course, the use of the term must be justified by the evidence and reasonable inferences drawn from the evidence. *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 45. Here, it was justified by the evidence that defendant committed acts of sexual penetration against both S.S. and S.F.

¶ 223   Lastly, defendant argues that the prosecutor misstated evidence. Referring to the lap-bouncing incident with S.F., the prosecutor described defendant as "grinding on a five-year-old girl." But S.F. said she was somewhere between the ages of 6 and 9 when this happened. So the

comment was in error. But inconsequentially so. The corresponding ACSA charge required proof that the victim was under 13 years of age. 720 ILCS 5/12-6(c)(1)(i), renumbered as 720 ILCS 5/11-1.60(c)(1)(i) by P.A. 96-1551 (eff. July 1, 2011).

¶ 224   At various points, the State described the lap-bouncing routine as a "game" and said that S.F. and S.S. both saw it as one. Neither witness, defendant says, offered that description in their own testimony. That is true of S.F., though S.S. did testify that at first, she thought this routine was "a joke" of some kind.

¶ 225   More importantly, we think the context of the State's remarks makes clear that they were argument, based on Dr. Fujara's testimony about grooming, rather than a literal summary of the victims' words. Dr. Fujara described grooming as a process of increasingly sexualized touching through which an abuser seeks to build trust and affection with the child. It typically begins with conduct that the child may see as innocent or "appropriate," and eventually escalates into sexual abuse or assault. The term "game" was a gloss on Dr. Fujara's description of the early stage of the grooming process as defendant, in the State's view, engaged in it with S.S. and S.F. Having heard Dr. Fujara's testimony, the jury could decide for itself what to make of the conduct.

¶ 226   In its closing argument, the State said that S.F. ran into her bedroom and told L.M. that "[h]e touched me." But S.F. could not recall what she said, and according to L.M., S.F. said that defendant "was trying" to touch her, not that he did touch her. So the State's recounting of the evidence was less than fully accurate. The jury heard the testimony and was instructed that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Illinois Pattern Jury Instructions, Criminal No. 1.03 (4th ed. 2000).

¶ 227   Defendant has more examples to offer, but we will leave it at that. In sum, most of the challenged remarks were not improper at all. The few that were improper were not so serious

that they denied defendant a fair trial, and thus they do not add up to a pattern of "pervasive" misconduct that qualifies as second-prong plain error. See *People v. Blue*, 189 Ill. 2d 99, 127 (2000). Nor do the limited errors undermine our confidence in the verdicts, given our assessment of the arguments and, more importantly, the evidence as a whole. So they do not amount to first-prong plain error or ineffective assistance, either.

¶ 228                                    VI. Sentencing

¶ 229    At the sentencing hearing, the trial court imposed two natural-life sentences: one for the PCSA conviction in the S.S. case, 13 CR 5937; and one for the PCSA conviction in the S.F. case, 13 CR 5936. (The mittimus reflects only one sentence, imposed in case 13 CR 5936, but "the court's oral pronouncement is the judgment of the court and controls over the mittimus" in the event of a disparity. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 62.)

¶ 230    Defendant does not raise any challenge to his life sentence in the S.F. case. But he does argue that his life sentence in the S.S. case was error. Because the State concedes the error, and we accept the concession, we will be brief.

¶ 231    The PCSA statute provides that "[a] person convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts shall be sentenced to a term of natural life imprisonment." 720 ILCS 5/12-14.1(b)(1.2), amended by Pub. Act 91-238 § 5 (eff. Jan. 1, 2000).

¶ 232    The trial court imposed both natural-life sentences pursuant to this provision, which was enacted after defendant committed the offense of PCSA against S.S. (but before he committed the offense against S.F.) Thus, applying this provision in the S.S. case violates the *ex post facto*

clause. There is no dispute that other provisions authorizing a natural-life sentence for PCSA do not apply to this conviction.

¶ 233 We vacate defendant's natural-life sentence in case 13 CR 5937, for the offense of PCSA against S.S., and remand to the circuit court for resentencing in that case only. His natural-life sentence in case 13 CR 5936, for the offense of PCSA against S.F., is affirmed.

¶ 234                                         CONCLUSION

¶ 235 For these reasons, we vacate defendant's sentence in case 13 CR 5937 and remand that case only for resentencing. The judgement of the circuit court is affirmed in all other respects.

¶ 236 Affirmed in part; reversed in part; vacated and remanded.