2024 IL App (1st) 211556-U

No. 1-21-1556

Order filed May 24, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 60066 |
| | ) | |
| SABRINA SHAFFER, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where the State failed to prove that defendant entered the victim's home without authority, we reverse defendant's home invasion conviction and remand for the trial court to impose sentence or vacate its findings of guilt on the remaining counts as instructed in this order.

¶ 2   Following a bench trial, defendant Sabrina Shaffer was found guilty of two counts of home invasion, one count of robbery, and four counts of residential burglary. The court merged the offenses into one count of home invasion (count XI) and sentenced Shaffer to 14 years'

imprisonment. On appeal, Shaffer argues that the State failed to prove her guilty of any of the offenses beyond a reasonable doubt. As the State failed to prove that Shaffer entered the victim's residence without authority, an element of home invasion, we reverse Shaffer's home invasion conviction. We also remand with instructions for the court to vacate its findings of guilt on counts XII, XIV, and XV, as those counts also required the State to prove that Shaffer entered the residence without authority, and to impose sentence on the remaining counts.

¶ 3                                      I. BACKGROUND

¶ 4        Shaffer was charged with multiple offenses related to the December 2015 death of Keith West: murder (counts I-X), home invasion involving entering West's dwelling without authority and beating him (counts XI and XII), robbery for taking West's jacket from his person or presence by force or threat (count XIII), residential burglary based on entering West's dwelling without authority and with the intent to commit therein theft and robbery (counts XIV and XV, respectively), and residential burglary based on remaining in West's dwelling without authority and with the intent to commit therein theft and robbery (counts XVI and XVII).

¶ 5        Prior to trial, the State filed a motion to admit "proof and evidence of other crimes to show the complete facts surrounding the murder of Keith West and the defendant's intent, motive, identity, and lack of mistake or accident." Pertinently, the State alleged that a few weeks before West's death, two employees of West's apartment building, Richard McDonald and Michael Richard, responded to a complaint of loud arguing in West's apartment. They went to the apartment and observed Shaffer yelling at West and standing over him while he sat on the couch and looked scared. Shaffer was yelling about money, saying "I know you got some." McDonald told Shaffer that she was banned from the building, and he and Richard escorted her out. In the

days following, West told McDonald and Richard that he was afraid of Shaffer, she had stolen from him, and he did not want her in the building.

¶ 6    The State further alleged that on December 26, 2015, Richard observed Shaffer walking down the building's stairs with a full garbage bag. He mentioned she had been banned from the building, and she stated that she had come for some of her things. She left, and Richard went to West's apartment, where he ultimately found West beaten and bleeding from injuries which later caused his death. The court ruled that the State could present evidence about Shaffer yelling at West but not that she had been "banned" from the building as McDonald did not have the authority to ban her and her disregarding his order was not a bad act.

¶ 7    At trial, West's sister Mary Jo Lewis testified that West had been legally blind. In 2015, she bought West a bright yellow coat to ensure others could see him. She identified photographs of somebody else wearing the coat. The photographs are included in the record on appeal and appear to be still frames taken from a surveillance camera. On cross-examination, Lewis testified that she did not know whether West let anyone else wear his belongings.

¶ 8    McDonald testified that in late 2015 he was the building engineer at an apartment building on the 4500 block of North Sheridan Road, in Chicago. The building had six floors. There was a front lobby entrance and an emergency exit in the back. Tenants had physical keys to access the front entrance. Only management had keys to access the building through the rear emergency exit door. Security cameras recorded the front of the building.

¶ 9    West was a tenant in the building and McDonald knew him. McDonald further identified Shaffer in court as visiting West in the building once or twice a week.

¶ 10    About three weeks before West died, McDonald heard yelling in West's apartment. He approached the apartment. The door was ajar, and West was sitting on his couch "quiet, like a deer in headlights," while Shaffer was pacing and yelling: "I know you got it, I know you got it." McDonald told Shaffer she should leave, and Shaffer yelled at him. He then escorted her downstairs and watched her leave.

¶ 11    About two weeks later, McDonald spoke with Shaffer in the building's lobby and told her that West had stated he no longer wanted her in the building. Following a hearsay objection by defense counsel, the State clarified that the testimony was not offered to prove that West did not want Shaffer in the building but "as a precursor to the Shaffer's statements about her relationship status with [West]." The court admitted the testimony for "what [McDonald] did with that information, not that it existed." McDonald continued that he told Shaffer that West mentioned he no longer wanted her around, and Shaffer told McDonald that West was her boyfriend, and McDonald could not tell her what to do and did not own the building.

¶ 12    Around Christmas 2015, McDonald received a telephone call from Richard around 3 p.m. Richard then texted McDonald a photograph of West on the ground injured.

¶ 13    On cross-examination, McDonald agreed that West had been old and frail. McDonald had testified before the grand jury that the day he escorted Shaffer from the building, she had been talking quietly to West to "put on a good act for [McDonald]," until he said another tenant stated Shaffer and West had been yelling. He also testified to the grand jury that he told Shaffer, "if you f*** with [West], you f*** with me. Don't f*** with [West]." The court admitted that testimony over the State's objection as it "raise[d] issues that might affect bias." Shaffer packed a few bags and took them the day McDonald escorted her out. He had seen her leave the building with bags

before. McDonald confirmed that he testified to the grand jury that Shaffer once told him that West was her boyfriend and McDonald told her to shut up. After his phone conversation with Richard, he was "upset because [he] believed [Shaffer] had hurt Mr. West."

¶ 14    On redirect examination, the State asked why McDonald believed Shaffer had hurt West. Defense counsel objected and the State requested a sidebar. The State argued that the defense had opened the door to a bias McDonald had against Shaffer and requested to elicit the basis for that bias. As an offer of proof, the State explained McDonald might testify that other tenants had complained about Shaffer and that she had performed "destructive actions" in the building, such as defecating in the elevator. The court ruled that the defense had brought out that McDonald did not like Shaffer and the State could establish his motivation for that opinion. The court clarified that the evidence was "never going to be [admitted] for the truth of the matter" asserted or "to prove any element" of the offenses.

¶ 15    Following the sidebar, McDonald agreed that when he got off the phone with Richard, he was "upset because [he] thought that Shaffer was involved." Defense counsel objected and the court admitted the testimony for "the limited purpose" the court had explained. McDonald further testified that he did not like Shaffer because West had told him that West was afraid of her, and she stole money from him. The court admitted that testimony over objection "[o]nly as it applies to his bias."

¶ 16    Richard testified that, in December 2015, he worked as a custodian at West's apartment building and knew West. Each tenant was issued a key to the front door but only McDonald had access to the back door. Richard had seen Shaffer entering and exiting the building two or three times, and a week or two before December 26, 2015, saw her inside West's apartment.

¶ 17    As Richard prepared to leave work between 3 and 3:30 p.m. on December 26, 2015, he saw Shaffer, whom he identified in court, descending the apartment building's stairs carrying a "huge" black garbage bag that appeared to contain items. Richard asked why she was in the building. Following the conversation, Shaffer exited the front door.

¶ 18    Richard closed the building's office, then went to West's third-floor apartment. The door was closed. Richard knocked multiple times, and no one answered. He went to McDonald's office for keys to West's apartment, then returned. He knocked again and no one answered. He opened the door, which had been unlocked. He entered and found West lying on the floor. West's face was bruised, and he had blood around his mouth and nose. Richard went downstairs to find another employee, James Weinmann. They returned to West's apartment about four minutes after Richard had left. They entered and Richard saw that West was breathing. He took a photograph of West and identified it at trial. It is included in the record on appeal and depicts a man lying on his back with his arms splayed, his eyes open, bruises on his face, and blood around his mouth.

¶ 19    Richard identified a photograph that depicted how Shaffer appeared on December 26, 2015. The photograph is another copy of one of the images that Lewis identified as depicting a person wearing West's yellow coat. The person is also holding a black garbage bag that appears mostly full.

¶ 20    On cross-examination, Richard testified that he did not see Shaffer enter the building on December 26, 2015. When he saw her, she was descending the short flight of stairs down from the first floor of apartments, which was separated by "a long hallway" from the stairs to the remainder of the floors. He agreed that when they conversed, he was "really close" to her and did not notice

any bruising or blood on her person or clothing. Nor was she limping, out of breath, or running. He did not see anyone else leaving the lobby between 2:30 and 3 p.m. that day.

¶ 21    Weinmann testified that he had lived in West's apartment building and performed maintenance there. In December 2015, he worked in the building as a home healthcare provider and knew West. Around 3 p.m. on December 26, 2015, Richard told Weinmann something had happened. Weinmann accompanied Richard to West's apartment, where he saw West lying unresponsive on his back near the couch in the apartment's living area. He appeared to be bleeding from his mouth. His chest was moving up and down. Weinmann called 911. Paramedics arrived, "worked on [West] for a little bit," then put him on a gurney and took him to the hospital.

¶ 22    On cross-examination, Weinmann testified that many people regularly came and went from the building. Entry to the building required a key. The building did not have a doorman or security.

¶ 23    The chief medical examiner of Cook County testified that he reviewed West's autopsy report. West died on December 28, 2015. The autopsy report, which is included in the record on appeal, notes West was 63 years old. The examiner testified that there was evidence of extensive medical treatment to West's head, including staples, surgical incisions, and holes used to relieve pressure and drain hemorrhages. A craniotomy had been performed. He also had vascular catheters and tubes in his chest.

¶ 24    West had suffered numerous external and internal injuries. There were bruises on his head and around his eyes, and abrasions and a laceration on his face. There was evidence of numerous hemorrhages inside his head, which caused his brain to swell and soften. He suffered numerous large bruises on his chest and abdomen, including one that was 12 inches by 8 inches and another that was 12 inches by 5 inches. Internal injuries to West's torso included 14 rib fractures, some

from trauma and some from medical treatment. There were numerous bruises on his hands and arms. One bruise on his right arm measured five inches by four inches and one bruise on his left arm measured six inches by four inches. The injuries to his forearms and arms could be defensive injuries. There were also bruises on his thighs. All the injuries appeared to have occurred around the same time, one to three days before his death. West had cardiovascular disease, clot formation in his aorta, other organ problems, and tested positive for a cocaine metabolite, but died of homicide from blunt force injuries caused by an assault.

¶ 25    Chicago police sergeant Michelle Wood testified that she was a detective assigned to investigate West's case and went to his apartment on December 26, 2015. The apartment was messy and in slight "disarray." There were blood stains on the sofa beneath a green blanket. She identified photographs which are included in the record and depict, *inter alia*, dried red stains on a green blanket and light colored sofa, and a wallet on the ground surrounded by a Link card and three other cards. A few feet away from the wallet is what appears to be a Chicago Transit Authority (CTA) fare card. The wallet itself appears empty.

¶ 26    On February 4, 2016, Wood interviewed Shaffer, who identified a photograph of herself. Wood identified the photograph, which is one of the photographs that Lewis testified depicted someone wearing West's yellow coat. Wood interviewed Shaffer again the next day and recorded the interview. Wood identified a five-minute video clip of the interview. The State published that video and entered into evidence a transcription of that portion of the interview that the parties agreed was accurate.

¶ 27    The video and the transcription are included in the record on appeal. In the video, Shaffer states that she had lived with West, her boyfriend, for six years and still went to see him. On the

day West was found injured she had "come back down" from somewhere unspecified with two bags of cocaine, and someone "had knocked [West] out." West's wallet was empty. Shaffer thought West was alive. She left wearing West's yellow jacket and his "favorite" boots that he did not like her to wear and took three of her outfits. She states she does not know why she left as leaving and taking her clothes made her look guilty, but she is innocent. As she left, she saw someone working and did not tell him that West had been robbed or was lying on the floor. She did not know why.

¶ 28      Wood further testified that West's yellow jacket and boots were never located.

¶ 29      On cross-examination, Wood agreed that "at another point in the [interview] that was not shown, [Shaffer] stated that someone else was there and that person robbed Keith West." Wood also testified that she reviewed video taken by the apartment building's surveillance camera which covered from 10 a.m. on December 26, 2015, to Shaffer's walking away from the building at 2:58 p.m. The defense published an approximately 10-second clip of the video to refresh Wood's memory about another person who left the building at 2:51 p.m.

¶ 30      A longer portion of the surveillance video, the foundation of which the parties stipulated to, is included in the record on appeal and has been reviewed by this court. It contains a timestamp dated December 26, 2015, begins at 12 p.m., and goes through 3:10 p.m. It depicts an awning that appears to cover a doorway, but the door is not visible. Several people appear to exit the building between 2:51 and 2:58 p.m. At 2:58:50 p.m., a person in a yellow coat appears to exit the building dragging a large black bag. The person is wearing the same clothing as the person the witnesses had identified in photographs as Shaffer in a yellow coat, although the angle of the video reflects that it was recorded by a different camera than the one from which those images originated. The

person pauses and looks around, then turns right and follows the sidewalk under the camera and out of view. The video shows many people entering and exiting the building between 12 p.m. and 3:10 p.m. but does not reveal a person in a yellow coat entering or exiting the building at any other time besides 2:58 p.m.

¶ 31    On redirect examination, Wood testified that Shaffer told her the person who robbed West had entered the apartment building with her. She described the robber and no one on the surveillance video matched the description. On recross examination, Wood confirmed that she reviewed several hours of surveillance video, and it did not show Shaffer entering the building.

¶ 32    The State entered several stipulations, including that an evidence technician would testify he recovered a green sweatshirt, wallet, Link card, business cards, and CTA fare card from West's apartment. A forensic scientist from the Illinois State Police testified that he performed DNA analysis on the items. Pertinently, one of the business cards contained a mixture of two DNA profiles from which West and Shaffer both could not be excluded. The statistical frequency was 1 in 26 for both Shaffer and West. The sweatshirt had three DNA profiles, and Shaffer and West could not be excluded, with a frequency of 1 in 550 million.

¶ 33    Following argument, the court found Shaffer not guilty of murder (counts I-X) and guilty of home invasion (counts XI and XII), robbery (count XIII), and residential burglary (counts XIV-XVII).

¶ 34    Shaffer filed a motion and amended motion to reconsider or for a new trial, which the court denied. Following a hearing, the court merged all the counts into one count of home invasion (count XI) and imposed 14 years' imprisonment thereon. The court denied Shaffer's motion to reconsider the sentence. This appeal followed.

¶ 35                    II. ANALYSIS

¶ 36    Shaffer now appeals. She argues that the evidence was insufficient as to all counts of which she was found guilty. We begin with count XI, the count on which Shaffer was sentenced.

¶ 37    Due process requires that a defendant may only be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [s]he is charged." (Internal quotation marks omitted.) *People v. Grayer*, 2023 IL 128871, ¶ 27. When a defendant claims the evidence was insufficient to prove her guilt, we "must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *Id.* We must draw all reasonable inferences in favor of the State, and the evidence need not exclude every alternative explanation consistent with innocence. *Id.* ¶ 32. We may not retry the defendant or substitute our judgment for the factfinder on questions involving the weight of the evidence or the witnesses' credibility. *People v. Conway*, 2023 IL 127670, ¶ 16. However, we will reverse a conviction if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 38    To prove Shaffer's guilty as charged, the State had to establish that she: (1) was not a peace officer acting in the line of duty; (2) without authority, knowingly entered another's dwelling and knew or had reason to know someone was present in the dwelling; and (3) intentionally injured someone in the dwelling. 720 ILCS 5/19-6(a)(2) (West 2014). Here, the State charged in count XI that Shaffer knowingly and without authority entered West's dwelling and knew or had reason to know someone was present and beat West within the dwelling place.

¶ 39 Shaffer argues that the State failed to prove she entered West's dwelling without authority or injured him. We agree that the State failed to prove she entered West's dwelling without authority. "[A] defendant enters the dwelling place of another 'without authority' when either the occupant has not granted consent to enter, or a court order has prohibited entry." *People v. Witherspoon*, 2019 IL 123092, ¶ 25.

¶ 40 The record does not establish that Shaffer entered West's apartment without authority. McDonald testified that she visited West regularly. Richard had also seen her in the building before. The apartment building only had one entrance accessible to tenants, which required a key. Further, Richard found West injured after Shaffer left at 2:58 p.m., but Wood testified the surveillance footage does not show her entering the building. Wood testified that the footage she reviewed began around 10 a.m., and the footage included in the record on appeal begins at 12 p.m., implying that Shaffer entered West's apartment at least a few hours before Richard found West injured. The State concedes in its brief that "the record does suggest that Shaffer was allowed entry on that day because it was a building that limited access to residents, guests and staff and required a key."

¶ 41 Notwithstanding, the State argues that Shaffer committed home invasion under the limited authority doctrine. The limited authority doctrine provides that when a defendant is invited into a private residence, the authorization to enter is limited and exceeded by criminal acts. *United States v. Glispie*, 2020 IL 125483, ¶ 14. Therefore, if an entrant intends to commit criminal acts within a residence, his entrance cannot be said to be authorized. *Id.* ¶ 15. However, the entrant must possess a criminal intent at the time she enters the dwelling. *Witherspoon*, 2019 IL 123092, ¶ 13. The

limited authority doctrine does not apply where the defendant entered with an innocent intent but later committed a crime. *People v. Bush*, 157 Ill. 2d 248, 255 (1993).

¶ 42    Here, even viewing the evidence in the light most favorable to the State, there is no evidence establishing Shaffer's intent when she entered West's apartment. The record shows that she entered at least a few hours before Richard found West injured around 3 p.m. Although she told Wood she entered with the person who robbed West, there is no evidence establishing the timing or circumstances surrounding the infliction of West's injuries. Without evidence regarding the time at which West was injured as related to the timing and circumstances of Shaffer's entry, no rational trier of fact could find beyond a reasonable doubt that she entered the apartment with a criminal intent.

¶ 43    The State disagrees, arguing that the circumstantial evidence indicating Shaffer robbed West establishes that she intended to do so when she entered his apartment. See *Grayer*, 2023 IL 128871, ¶ 28 (absent direct evidence, intent may be inferred from circumstantial evidence); *People v. Maggette*, 195 Ill. 2d 336, 354 (2001) (criminal intent may be proven by circumstantial evidence such as time, place, and manner of entry, activities while within premises, and alternative explanations for presence). In addition to leaving with West's jacket, the State notes that Shaffer told Wood that West's wallet was empty and her DNA could not be excluded from the DNA found on one of the business cards near the wallet. The State additionally points out that McDonald testified that he had previously seen Shaffer yell at West, escorted Shaffer from the building, and told her that West did not want her around. McDonald further testified that West told him West was afraid of Shaffer and Shaffer had stolen from West.

¶ 44    However, the court admitted McDonald's testimony on those points for its effect on him, not the truth of the matter asserted or "to prove any element" of the crimes. Further, McDonald's impressions of Shaffer and West's relationship does not establish that Shaffer had a criminal intent at the time of her entry on or around December 26, 2015, which none of the witnesses observed. Again, without a criminal intent at the time of entry, the limited authority doctrine does not apply to make Shaffer's entry unauthorized. *Witherspoon*, 2019 IL 123092, ¶ 13. As the evidence does not show she had a criminal intent when she entered, no factfinder could find that Shaffer entered West's apartment without authority. Hence, the State failed to prove all the elements of home invasion beyond a reasonable doubt. See 720 ILCS 5/19-6(a)(2) (West 2014). Accordingly, Shaffer's home invasion conviction on count XI cannot stand.

¶ 45    Shaffer also challenges the sufficiency of the evidence to prove her guilt of counts XII-XVII. However, we do not have jurisdiction to review Shaffer's claims on those counts. Although neither party questions our jurisdiction, we have a duty to consider it *sua sponte*. *People v. Blancas*, 2019 IL App (1st) 171127, ¶ 11.

¶ 46    As the final judgment in a criminal case is the sentence, a defendant may only appeal convictions on which a sentence has been imposed. *People v. Relerford*, 2017 IL 121094, ¶ 71; *People v. Jones*, 2019 IL App (1st) 170478, ¶ 24. Where guilty findings on some counts merge into another count on which sentence has been imposed, we generally cannot review the merits of a claim against the unsentenced counts. See *People v. Fort*, 2019 IL App (1st) 170644, ¶ 37.

¶ 47    Notwithstanding, several of the other counts that Shaffer challenges share an element with count XI that Shaffer entered West's apartment without authority: count XII, which charged that Shaffer committed home invasion by entering West's dwelling without authority, remaining until

she knew or had reason to know someone was present, and beat West within the dwelling; and counts XIV and XV, which charged that Shaffer committed residential burglary by entering West's apartment without authority with the intent to commit, respectively, a theft and a robbery. The limited authority doctrine applies equally to residential burglary as to home invasion. *Glispie*, 2020 IL 125483, ¶¶ 17, 22.

¶ 48 Thus, the guilty findings on counts XII, XIV, and XV cannot stand, as we have already found the evidence was insufficient to prove that Shaffer entered West's dwelling without authority and reverse Shaffer's conviction on count XI, into which those counts merged, on that basis. Therefore, we remand the matter for the trial court to vacate its findings of guilt on counts XII, XIV, and XV. See Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967); *Fort*, 2019 IL App (1st) 170644, ¶¶ 25-35, 37 (reversing sentenced conviction of attempted identity theft and unsentenced conviction of identity theft where there was insufficient evidence the defendant knowingly used the social security number of another, but declining to review unsentenced forgery convictions); *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶¶ 34-42 (reviewing sentenced convictions for criminal sexual assault and unsentenced convictions for aggravated criminal sexual abuse where defendant challenged force element applying to all counts).[1]

¶ 49 The remainder of the counts on which Shaffer was found guilty, counts XIII, XVI, and XVII, do not have as an element that she unlawfully entered West's apartment. Our jurisdiction

---

[1] See also *People v. Byrd*, 2023 IL App (1st) 220571-U, ¶¶ 39-42 (where evidence was insufficient to prove defendant possessed a firearm, vacating sentenced conviction for unlawful use or possession of a weapon and remanding for circuit court to vacate findings of guilt on unsentenced convictions based on the same evidence); *cf. People v. Maria*, 2023 IL App (1st) 191607-U, ¶¶ 55-56 (affirming sentenced convictions but noting that, if we were to reverse sentenced convictions, defendant's sufficiency challenge on unsentenced convictions "would properly be at issue"). Unpublished orders filed under Rule 23(b) may be cited as persuasive authority. Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

over those counts is limited to remanding the cause for the circuit court to impose sentence. *Relerford*, 2017 IL 121094, ¶ 75; *Fort*, 2019 IL App (1st) 170644, ¶ 37. We remand this matter for the court to impose sentence on counts XIII, XVI, and XVII. After sentencing, if Shaffer wishes to challenge the sufficiency of the evidence as to those counts, we may address those arguments on appeal. See *Fort*, 2017 IL App (1st) 170644, ¶ 37.

¶ 50                                    III. CONCLUSION

¶ 51     We reverse Shaffer's conviction on count XI. We remand with instructions for the circuit court to (1) vacate its findings of guilt on counts XII, XIV, and XV, as the evidence was insufficient to prove Shaffer's guilt of those counts, and (2) impose sentence on counts XIII, XVI, and XVII.

¶ 52     For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand with instructions.

¶ 53     Reversed and remanded.